# Charleston.

JAMES J. DEEM *vs.* BENJAMIN PHILLIPS *et al.*

January Term, 1872.

1. Erasures and material interlineations made in a deed after it is acknowledged by the grantor, not in his presence and without his assent, vitiates it and renders it null and void.

2. A case in which a contract is set aside on account of gross inadequacy of consideration.

3. A case in which a contract is set aside on the grounds of there being undue influence exercised in its procurement, by a son upon his father, who was in extreme old age and bodily infirmity and mental weakness.

Philip Deem died in January, 1865, in the eighty-first year of his age, leaving James J. Deem and six other children; also nine grandchildren, the descendants of his deceased daughters, Elizabeth and Rowena, his heirs-at-law. This suit was brought against James J. Deem by the other heirs-at-law of Philip Deem, deceased, to require the defendant to produce two paper writings, the one purporting to be an agreement made and executed by and between Philip Deem, in his lifetime, and James J. Deem, dated the 29th day of December, 1863, whereby Philip, in consideration of the care and trouble that James had had with him, and might thereafter have, until he, Philip, should die, Philip agreed to have executed a good and sufficient deed or deeds for all his real estate or lands to James J. Deem; and in further consideration that James thereby agreed to take good care of, in feeding and clothing, &c., &c., his father, Philip Deem, until his death.

The other writing to be produced purported to be a deed executed by Philip Deem on the 20th day of February, 1864, pursuant to the contract, conveying to James five tracts of land therein described.

The prayer of the bill was, that these writings might, by a decree of the court, be annulled and cancelled, that partition be made of the lands, and an equal share thereof be assigned to each of the heirs of Philip Deem, and that an account be taken of the rents, &c.   The grounds alleged for the cancellation of these writings were that Philip Deem was at the times of their respective dates, and for several years before and subsequent, by reason of extreme old age, greatly impaired in his physical and mental powers; that he was at the time upwards of eighty years of age—in fact, in his dotage, and easily influenced by those having charge of him; that he was left alone upon his farm, his wife having died several years before; that his children had married and settled elsewhere; that in 1860 or 1861 James and his family moved on the home place, and resided with the old man in the dwelling-house in which he lived; that in 1863 James conceived the idea of appropriating and securing to himself the entire estate of the old man, to the exclusion of his brothers and sisters and sisters' children, and that with the assistance of one Charles T. Lewis as scrivener he prevailed upon the old man to enter into the written agreement; that afterwards James, with the assistance of Lewis, to-wit, on the 20th of February, 1864, prevailed upon the old man, then in his dotage, to execute the deed.

It was further alleged that neither of these writings was the voluntary and binding act of Philip Deem, but they were obtained from him by undue and improper influence of James and his family.   The bill also alleged that the consideration expressed in the contract was feigned and pretended, that instead of James providing for the old man, it was in fact the old man who provided for him, and that even as a bargain the consideration was so flagrantly inadequate as to shock the moral sense.   It was further charged that the papers were executed with great secrecy, and without the knowledge of the other members of the family.   And finally, the bill charged that the deed as at first written and executed was wholly in red ink, and subsequent to its delivery a material portion thereof was erased, and other and different matter written over it in black ink, by or at the instance of James J. Deem.

The answer denied that the mental powers of Philip Deem were weakened by age, although his physical powers were impaired; it further denied that he was easily influenced, either by James or any one else. It denied all fraud and collusion on the part of James, and that he ever directly or indirectly tried to induce his father to execute the contract and deed, but averred that they were the free, voluntary and unsolicited acts of his father; in short, denied all the material allegations of the bill as to such matters as would tend, if true, to invalidate the contract and deed.

The circuit court of Wood county, in which the suit was brought in March, 1867, by a decree rendered at the April term, 1868, declared the contract and deed to be ineffectual to bar the relief sought for in the bill, and ordered a partition of the lands among the heirs of Philip Deem.

It is unnecessary to set out any of the testimony concerning the erasures and interlineations of the deed, except to state that the scrivener testified that the greater part of the alterations were made in the presence of, and at the request of James J. Deem, and that the grantor, Philip Deem, was not present and never assented, so far as witness knew. The alterations were changes in the description and boundary of some of the lands mentioned in the deed, and some of them increased the number of acres. Upon the question of the competency of Philip Deem to make the contract which preceded the deed, a mass of testimony appears in the decree.

F. W. G. Camp testified that he heard him make some disparaging remarks about the Union troops, in 1862, and his son, James J. Deem, apologized, saying that the old man was childish; there were some Union soldiers present.

R. Foultz testified that he had known him for many years; had not conversed with him during the last two years of his life; was of opinion his mind was not sound; did not think him capable of transacting important business; had heard him say that he did not intend to make a will, that the law had provided as good a one as he could make.

John Daily testified that he had seen the deceased sitting in a chair in the winter of 1863-64, with a cut over his eye, which James J. Deem told him was the result of a fall received the night before; James J. thought he had been struck with palsy.

Peter Dillon testified that the deceased had told witness, in reply to a suggestion from the latter, that he had better fix up his business as he might drop off at any time, that he would do no such thing; that he was not capable of making as honest a will as the law provided; that his estate would be divided by law after his death; this was about the year 1861.

Dr. James B. Humphrey testified that he had bought two or three books of him, and about three weeks afterwards he wanted to sell them to witness again; that he had borrowed ten dollars of him, and when he went to pay it the old man had forgotten it; thought he was very childish.

Jacob Hatfield testified that the old man talked very wild and foolishly in 1862; did not consider him capable of doing business, or of sound mind; was highly excited about the war.

George W. Troyman testified that he thought him of unsound mind; he had asked him twice for money which he had already paid him; he seemed very childish; had paid harvest hands about that time as they counted the amount due them.

T. L. Siders had known him but a short time before his death; was about his house a great deal; sometimes thought he appeared rational, and then again not so; had seen him the evening after an attack of palsy; on inquiry he said he was not well; was over on Tygart the day before; had seen the d——st fool he ever saw; saw a man clearing a piece of land and cutting the stumps off as high as his head; thought at that time he was entirely "out of his head."

Solomon Hawkins was acquainted with the decedent from April 1st, 1864, till his death; he was old and feeble; saw him have spells or fits, and would sink down and seem lifeless; spells increased in number till his death; could not recollect witness from morning till noon; during his last sickness, if he was not willing to take his medicine, the family would call James J. Deem, who would tell him he must take it, and after muttering a little he would do so.

Almyra Nulten testified that she lived with deceased in 1861; did not think him of sound mind then; was childish.

Cornelius P. Cain had been acquainted with him for thirty years; at the first of the year 1864 did not think him capable of transacting business.

Joseph Stewart thought him childish; that his mind was declining in 1861.

Sarah Hawkins considered him childish; did not know her on one occasion; said at one time that it had rained hard that morning, and the water was over shoe-top deep in the yard, when it had not in fact rained for some weeks.

William H. Douglass proved that James J., some time between May, 1863, and August, 1864, had told him not to issue any execution against his father, as he was not attending to any business; that the business was all done through him.

Isaac Jackson did not consider him able to do any business in 1862.

H. L. Jackson thought him childish in 1862; did not think he had much judgment or mind.

Eliza Jeffers lived with him after the death of his wife in 1860; thought his actions singular; considered him childish; said James J. often got money from him; that the old man kept James J. after he went to live with him, instead of the reverse.

F. J. Marshall thought him out of his mind in the spring of 1864; had some conversation with him; he repeated about his trip on Tygart; and his seeing a man cut stumps as high as his head, &c.

For the defendant, it was proved by John Douglass that he did not think him insane.

Benjamin Wells, in 1864, stayed all night at the deceased's house; did not discover anything wrong with his mind.

John Sharpnack had been to see him in the fall of 1864; found him well; had considerable conversation with him; he was entirely rational; saw nothing wrong with him.

James McKinney saw him in 1864; did not see that his mind was much changed; he seemed to be in his right mind.

Jesse Cain knew him about seven years; stayed all night at his house in 1864; saw nothing wrong with him; asked and answered questions as a rational man would.

James H. Harris had been commissioner of the revenue in 1862; James J. Deem gave in his property in that year and his father gave in his, and the latter remarked that it was about the last time he would do so; that he was old, and it was no use for him to keep personal property; that he was

going to make a deed to his son James J. for his place, and the latter was to keep him as long as he lived; saw nothing wrong with him; was as rational as any man.

R. W. Stuart thought him entirely rational in 1860.

J. D. Cain, in 1863, saw him frequently; thought he talked reasonably and as usual; saw nothing wrong with his mind.

Richard Rutherford knew the decedent forty years; had seen him every year until his death; in the last years of his life did not see anything wrong with his mind; would not have been afraid to have made a contract with him in 1863.

William T. Wells never saw anything that led him to believe he was of unsound mind, until within two or three months of his death; thought he was competent to make a contract in 1863.

Robert P. Steed had conversed repeatedly with him in 1862-3-4; he appeared to be as rational as ever; believed him to be of sound mind.

Samuel Warwick saw him in November, 1862; mind was good, and he was capable of making a contract.

Isaac Nulten had known him ever since 1817; never saw any difference in him, only that he was getting older.

John B. Townsend had several conversations with him in 1864; saw nothing like insanity, although he was laboring under severe bodily disease, but which did not impair his mind; was certainly capable of making contracts then. He remarked to witness that he was lucky in having gotten James to take care of him; that all the other members of his family had forsaken him, and if it had not been for James' family he would have suffered. The other members of the family seldom visited him.

James Kelley stayed all night at his house in 1864; in the morning deceased came out to look at some cattle witness had bought, and on being asked what they were worth, fixed about the price witness had paid for them; did not think anything was wrong with his mind.

Rebecca Middleton knew him about seventeen years; lived within a half mile of him; frequently conversed with him until the day of his death; in August, 1864, was talking with him; he was reading the war news and they were discussing it; saw nothing wrong with him.

J. R. M. Johnson conversed with him in 1863–64; thought he was of sound mind.

C. T. Lewis, who wrote the agreement and deed, proved that he was sent for by the decedent, who informed him that he wanted to make a deed for his lands to James J., and in reply to a question suggested by witness as to the effect of the deed upon the other heirs, he said he knew it, but James was to keep him as long as he lived, and he intended to leave his lands to him; witness thought him entirely sound in mind.

On the question of undue influence, it was proved that the estate conveyed was worth about six thousand dollars; it was conveyed in fee simple in consideration of the sum of one dollar. That James J. was a poor man when he moved on his father's farm place in 1860, with a large family. That the rent or use of the farm would have been an ample compensation for boarding and clothing the decedent. That James J. had on one occasion, before the death of his father, told the witness that there was something left out of the deed, and that C. T. Lewis would be up to put it in, and asked witness to be present and if he could swear that his father was in his right mind up to his death, to which witness replied that he could not.

· The testimony of Archibald Rutherford, the justice of the peace before whom the deed was acknowledged, and which was regarded by the court as of great weight on this branch of the case, is as follows: On the 20th day of February, 1864, James J. Deem's son Philip came to me where I was at work, and told me that his father wanted me to come down and fix up some papers or other; that Charley Lewis was there and they were fixing up some papers and they wanted me there. I went down immediately; found C. T. Lewis there; after the usual salutations Lewis said: "We have been making or writing a deed from Philip Deem to James, conveying his land to James, and he, Lewis, requested me to look at it, which I did; made some little alteration in it, which was in changing it from Virginia to West Virginia. There were several tracts of lands described in the deed, and a place left vacant, which place Lewis and James J. Deem said to me was to be filled up with another tract when the description of it could be gotten, which they said was lost. Then Philip Deem,

who was sitting on the other side of the fire-place, was called over to the table by Lewis, who told him that we had gotten this thing fixed (or ready), I do not remember which, to which remark Mr. P. Deem said well; then Lewis asked him in these words: "You want to have this thing done; you want to have your name signed to it?" to which he replied "yes." Then Lewis asked him if he, Lewis, should sign his name for him. He, Deem, replied yes, which he, Lewis, did. Then I, acting as justice, asked Deem if he acknowledged that to be his act and deed, to which he replied yes, which I certified. I saw no other person there but James J. Deem and family, and Charles T. Lewis and Philip Deem; his daughter, Mrs. Bradley, came about the time I was leaving. After the deed was executed, Lewis remarked: "We have got that thing done, and I think there is only two ways in which it can be broken. One is they must prove that the old man was not in his right mind, which they cannot do, for the old man has as good a mind to-day as he has had ever since I knew him (stating how long he had known him.) And the other is that there has been undue influence used by Jim or somebody else to get him to make this deed." He said we will ask him and see what he says about it. Lewis asked him if James or any one else had used any undue influence to get him to do what he had done, to which Deem replied yes. Lewis then asked him the same question. Deem replied yes, there has. Then James said, he don't understand you. Then James asked him (his father) himself about the same question that Lewis asked him, to which he replied no. When James' son Philip came for me to go down to fix some papers he told me in these words. Said he to me: "Pap told me to tell you not to let these people down here know anything about it;" and after the papers were fixed, James told me to keep this thing quiet for a few days. He did not want these folks around here to know when I went to James J. Deem's house. Either Lewis or James (I do not recollect which) said we have sent for you to fix up a deed or some papers, I do not recollect which; both Lewis and James were present; I understood the remark made by James (these folks around here) to be the complainants in this suit. James told me when I went to his house on that day that his father had had some sort of a stroke; that

he had fallen down on the floor and hurt himself some; that his father was bad that morning, and had sent Philip down that morning to get Lewis to fix up some papers for him; he remarked two or three times that his father had been very bad that morning; I did not see anything wrong with the old man, mentally, more than usual. He did not say anything only when he was spoken to. There appeared to be something wrong with him; he appeared to be rather quiet to what I usually saw him; there appeared to be something wrong with his mouth; he did not speak as usual. I read the deed in an ordinary tone of voice. The old man was sitting some fifteen feet from me. I do not think he heard distinctly enough to know what I read, as he was very hard of hearing. The deed was not read by anybody else in my presence. About three weeks after the deed was aknowledged James told me that his father was deranged or flighty, I do not remember which of these two terms he used. I do not remember whether he assigned any reasons for it or not. The conversation took place in the road near my house. The deed was written with red ink. All that was written at the time it was acknowledged, and where it is in black ink, has been done since it was acknowledged. The third tract from the word "river" was left blank, and is now filled up with black ink; and the fourth tract, I think, was left blank, and is filled with mixed ink; and the fifth tract, which is now written in black ink, was written in red ink when it was acknowledged. The red ink has been erased and written in black ink. What the change is I cannot tell. I know that the tract of land which it purposed to describe was described in the deed at the time the deed was acknowledged. I never took the acknowledgment of this deed only on the 20th of February, 1864. On the 28th of March, 1864, I went to James J. Deem's house to take the acknowledgment of an article of agreement between James J. Deem and his father, which James had previously requested me to do. I took the article and told the old man here was the article of agreement between him and Jim. It had to be acknowledged. He said: "What article?" I told him the article between him and Jim. He said, "I have acknowledged it, have I not?" I told him, "No." Then he said, "What was it that I did acknowledge?" I told him he had

acknowledged the deed, and he then said, "What is that?" I told him it was an article of agreement signed by him and Jim; that Jim was to keep him, and he was to make James a deed for his land. He then said no more. I then asked him if he acknowledged it, and he said "Yes." At the time I took the acknowledgment of the deed I told James that the deed would have to be stamped, and told him I had stamps. He said he would come up that night and get them. He came up, and I stamped the deed and the article of agreement, putting a fifty cent stamp on the deed and a five cent stamp on the article, and cancelled them. I think the land embraced in the deed at the time the deed was made was worth seven thousand dollars, and it might be worth more.

The defendant appealed to this court.

*W. J. Boggess* for appellant.
*Lee* for the appellees.

BERKSHIRE, P. The object of the bill filed by the appellees against the appellant and others, in the circuit court of Wood county, was to impeach and set aside, as fraudulent, the contract entered into between the appellant, James J. Deem, and his father, Philip Deem, now deceased, on the 29th of December, 1863, for the sale and purchase of the real estate of the latter, as well as the deed from the latter to the former, made in pursuance of said contract on the 20th day of February, 1864. The appellant resists the bill, and claims that the contract is a just and valid one, was fairly and honestly entered into, without any fraud or imposition on his part, and was founded on adequate consideration. And also insists that the deed is, in like manner, free from objection, and valid. First as to the deed:

The original deed, upon a writ of *certiorari*, was brought before us for our personal examination. From an inspection of it, as well as from the testimony in the cause, it appears that extensive erasures and material interpolations were made in the deed after it had been acknowledged by the grantor, Philip Deem. It further appears that these erasures and insertions were made by the scrivener who drew the deed, in the presence, and at the instance of the appellant,

but not in the presence of the grantor, Philip Deem; and it does not appear that the latter ever assented to the same, or saw the deed after such changes had been made in it. In my view, the erasures and interlineations thus made were sufficient to vitiate the deed, and it must therefore be held null and void. 2 Par. on Contract, p. 223-4 (note q); *Moore, &c.,* vs. *Beckham, Lessee,* 4 Binn., 1; *Steele, Lessee,* vs. *Spencer and others,* 1 Peters R., 552.

Second: How stands the case upon the *contract?*

It was earnestly maintained by the counsel for the appellant, that the contract, at least, was free from objection, and ought to be enforced in a court of equity as against the heirs of Philip Deem. There is a great deal of conflicting testimony in the record, touching the capacity or competency of said Deem to make such contract or to execute the deed. It is shown that at the date of the contract, Philip Deem was about seventy-nine years of age, was diseased, and both his physical and mental powers thereby impaired, and in the opinion of many of the witnesses, he had no legal capacity to make such a contract; and instances of his sayings and conduct about the time are given by them, which would seem to be wholly incompatible with a sane mind or legal competency to make a contract. But the weight of the whole testimony on this point, I think, preponderates in favor of the appellant, and if the case is to be determined *alone* on the question of the capacity of said Deem to make a contract, I would think the decree rendered erroneous.

It is charged in the bill, however, and was insisted on in the argument, that the contract in question was not voluntary and binding on the part of Philip Deem, but was procured by James J. Deem by means of an improper influence exercised over the mind of the former. While there is no *positive* evidence found in the record to establish the charge of undue influence on the part of James J. Deem, and while, if the case was to turn solely on this question, the evidence might be insufficient to satisfactorily prove such charge, yet, in my judgment, there are facts and circumstances surrounding the case which are well calculated to awaken grave suspicion as to the fairness of the contract, and the means by which it was procured. In considering the question of undue influ-

ence exercised over a party making a contract, conveyance or will, it should always be kept in view that it rarely happens that such improper influence can be established by *direct* or positive evidence. In its nature it is scarcely susceptible of such proof, but is rather to be *inferred* or deduced from the established facts and circumstances surrounding the case, that such influence, though often unseen and silently exerted, may nevertheless be most potent and effective to accomplish the purpose of the party exercising it.

The facts and circumstances, in my view, clearly tend in this direction. Up to the time that James J. Deem moved into the house with his father, it does not appear that he had ever expressed any dissatisfaction with any of his other children or grandchildren, or indicated any disposition or purpose to make any distinction or preference between them in the disposition of his estate. But on the contrary, it is shown by the testimony that he had declared that he *never* would do so, or convey or part with any of his estate during his life; and that *he* was incompetent to make as good a disposition of his property as the *law* would make, &c. Now, it is a pregnant·*fact* that not very long after the son had so removed in the house with him, and took charge of him and his property, a radical change was wrought in the old man's mind, in respect to his property and his other children and heirs, and he has done precisely what he had so often and so positively declared and vowed he never *would* do. What superinduced this great change in his mind, can only be conjectured. But it is clear that no actual necessity existed for such a disposition of his property, in order to his comfortable support; and that it was repugnant to his natural feelings and purposes, as declared before the son occupied such peculiar relations to him. The facts proven by Rutherford, the justice who took the acknowledgment of Philip Deem to the deed in question, as to what occurred at the time, seem to me to be equally suggestive. He says he was sent for " to fix up some papers," as he was informed by the son of James J. Deem, who came after him, at the instance of *his father ;* that when he arrived at the house of Philip Deem, he found C. T. Lewis, the scrivener who wrote the contract and deed, and James J. Deem present, and the former said that "*we* have

been making or writing a deed," &c.   That Philip Deem was entirely passive and suggested nothing, and only *assented* to the suggestions and request of Lewis and James J. Deem. That when the deed had been acknowledged (no one being present but the witness and Philip and James J. Deem and Lewis), Lewis immediately remarked, " We have got that thing done, and I think there is only two ways in which it can be broken; one is that they must prove that the old man was not in his right mind, *which they cannot do*, for the old man has as good a mind to-day as he has had ever since I knew him; and the other is that there has been undue influence used by Jim or somebody else to get him to make this deed."   And Lewis then said, "We will ask him (the old man) and see what he says about it;" and then asked him twice if James or anyone else had used any undue influence to get him to do what he had done, to which question he replied each time, " *Yes, there has;*" and James then asked him about the same question, saying, he don't understand you, to which he replied, "No."   Although the effort to impeach Lewis must, from the testimony, be regarded as a failure, his conduct on this occasion I think, is significant, and calculated to impair the force or weight of his testimony. He certainly manifested an unusual degree of interest in the transaction, and exhibited no little bias in favor of James J. Deem; and his feelings and actions can only be explained upon the ground that he had misgivings as to the *fairness* of the transaction, and wished to aid and sustain James J. Deem, in case of threatened or anticipated litigation with the other heirs of his father, by securing in advance, evidence to meet the charges that might be made as to the capacity of the grantor, or undue influence exercised over him.   Another significant fact proved by Rutherford is, that James J. Deem wished him to keep the transaction *quiet* for a while, in order that the other heirs might not know what was going on, as he did not wish them to know about it.   As to the consideration upon which the contract was founded, it purports to be *solely* a valuable one, and must be considered in that light. That it was a full and adequate consideration, cannot be maintained; for it clearly appears from the testimony that the estate of Philip Deem, which it is claimed he sold to

James J., was worth at the time about (averaging the testimony) six thousand dollars, and that the use or income of the same was ample for the said Philip's comfortable maintenance and support during his life. Now, while mere inadequacy of price or consideration is not of itself sufficient to set aside or annul a contract, yet such consideration may be so completely .and grossly so, that a court of equity will grant relief against it by rescinding it altogether. The *degree* of inadequacy to produce such a result is not well defined or easy to determine, and the precise boundary between the two classes of cases is not well settled. It has been said that to induce a court of equity to annul a deed or contract on account of inadequacy of consideration, it must be so gross that upon first blush it "shocks the conscience" and produces an exclamation of surprise and reprobation in indifferent persons. We have before us the case of a man in his extreme old age, physically and mentally impaired by age and disease, and tending, to say the least, strongly to mental and bodily imbecility, making a *contract* by which, without any necessity, and to the disinheritance of his other children and heirs, he sells his whole estate in fee simple, worth, as we see, some six thousand dollars, the consideration being his maintenance and support for the very few brief years remaining to him; while it is shown that the use or *income* of the estate contracted to be sold was fully equivalent to such maintenance and support, the same being the only *consideration* paid or to be paid by the grantee of such estate.

It seems to me, if such a case should fail to shock the senses .and to produce exclamations of surprise and reprobation in indifferent persons, it would be difficult to suggest one that could produce such a result. .Upon the whole case, therefore, I must concur in the opinion of the learned judge of the circuit court, in holding that such a case as the one before us ought not to be approbated or permitted to stand in a court of conscience.

The decree complained of must be affirmed, with costs and .damages.

The other judges concurred.

DECREE AFFIRMED.