# CHARLESTON.

## HALE v. COLE.

Submitted June 26, 1888.—Decided Nov. 24, 1888.

1. DEED—GRANTOr AND GRANTEE—DISINHERITING ONLY CHILD.

   Where the legal capacity of a grantor to make a deed is shown, and there is no fraud or undue influence established, he has the legal right to make an unjust, unnatural or unreasonable conveyance of his property. A conveyance, which wholly disinherits his only child, made upon a meritorious consideration alone, will not for that cause, of itself, be held invalid. (p. 581.)

2. DEED—GRANTOR AND GRANTEE—FRAUD—UNDUE INFLUENCE.

   Confidence in a grantee, and influence acquired by him over a grantor, by reason of acts of kindness and attention, do not in law constitute fraud or undue influence; and the fact that the grantee possessed such confidence and influence will not, of itself, vitiate a conveyance made by the grantor to such grantee. (p. 583.)

3. DEED—GRANTOR AND GRANTEE—FRAUD—UNDUE INFLUENCE—EVIDENCE.

   A case in which a bill filed by a son to set aside conveyances, embracing all the real estate of his mother, to two of her nephews, made shortly before her death, upon the grounds that the mother was mentally incompetent to make the conveyances, and they were induced by the fraud and undue influence of the grantees, is held not to be sustained by the evidence in the cause. (p. 584.)

*P. H. Keck* and *J. M. Hagans* for appellants.

*Berkshire, Sturgiss & Baker* and *J. Brannon* for appellee.

SNYDER, JUDGE:

Joseph Cole died testate early in the year 1850, in Monongalia county, leaving a widow, two sons, William and

Coverdale, and two daughters, Elizabeth and Mary. He was the owner of a considerable estate in said county, among which were the farm on which he resided, known as the "Home Place," and a tract of 190 acres of land five miles therefrom. By his will he gave all his real and personal estate to his widow for life, the remainder in the home-place he devised to his son Coverdale, and the remainder in the 190 acres to his daughters, Elizabeth and Mary, jointly, in fee and the right to live in the house with their mother on the home-place. The daughter, Mary, never married, but she had one child, Lewis C. Cole, who was born in 1847. Elizabeth, about the year 1836, married one Albert Hale, who, after living with her eight or nine months, deserted her, and went to the State of Indiana, and never lived with or did anything to maintain her thereafter. Shortly after her husband left her she had a son, whom she named Francis Marion. When this son was six months old his father came to the house of said Joseph Cole, where he was then with his mother, and clandestinely took him away from his mother to the State of Indiana, where he kept him until 1856, when, under the name of Abraham C. Hale, the name given him by his father, he visited his mother, in Monongalia county, where he remained several weeks, and then went to Weston, Lewis county, in this State, where he has resided ever since.

The widow of Joseph Cole, deceased, died in January, 1871. The two daughters, Elizabeth and Mary, continued to live with their mother on the home-place to the time of her death, and they afterwards lived there until their deaths, with the exception of about two years, 1878 and 1879, when they lived with Lewis C. Cole on the 190 acre tract of land.

Albert Hale obtained a divorce from his wife, Elizabeth, in August, 1839, in the State of Indiana, and afterwards married another woman in that State, where he continued to reside until December, 1884, when he came to Weston, in this State.

Lewis C., the son of Mary Cole, was raised in the family of his grandmother and lived on the home-place with her, his aunt Elizabeth and mother, until he was married, a

73

short time before the death of his grandmother, when he moved upon the 190 acre tract and has resided there ever since.

James B. Cole, a son of Coverdale Cole, when he was about six years of age, was taken into the family of his grandmother and aunts and continued to live there until the death of his grandmother and for some time thereafter.

By a written agreement dated December 19, 1874, executed by Elizabeth and Mary Cole, it was agreed that after the death of either of them the said 190 acres of land should be equally divided, and that Lewis C., the son of Mary, should have that on the south side of the road, and he was not to be charged with his improvements in an equal division of the land. This agreement was duly acknowledged by the said Elizabeth and Mary, and on April 3, 1875, admitted to record in Monongalia county. In 1879 the said Elizabeth and Mary caused the said 190 acres to be surveyed, and on March 8, 1879, they executed and acknowledged a deed, by which " in consideration of one dollar and of natural love and affection, and also past care and kindness bestowed upon them by the grantee," they conveyed by metes and bounds to said Lewis C. Cole, the son of the said Mary, 150 acres of said 190 acres, including therein all the land on the south side of the public road and all on the north side, except about forty acres, subject to the following reservation : " The said parties of the first part hereby reserve the right to occupy and control during their natural lives, or the natural life of either of them, so much of said land hereby conveyed as they may elect to occupy and control, and to rent out the same, and receive the rent for same, as they may elect, during the same time." This deed was duly recorded, March 15, 1879, in said county.

Subsequently, by deed dated September 10, 1879, the said Elizabeth and Mary, "in consideration of one dollar and good will for the grantee, and in the further consideration of the grantee agreeing to furnish the grantors one half part of their necessary and comfortable support (jointly) with L. C. Cole, who is held for the residue thereof, during the period of their natural lives or the life of the surviving one of them, also the payment of the sum of five dollars to A. C. Hale

within sixty days after the decease of the said Elizabeth," conveyed to their nephew, James B. Cole, the residue of the said 190 acres, being about forty acres on the north side of the road, subject to the following reservations: "The said parties of the first part retain a life-time right therein to secure the aforesaid support, which is hereby held and expressly reserved against said land for the faithful rendering or furnishing thereof; and, if said one half of their support during life as aforesaid is duly and properly furnished by said grantee, then he shall remain in undisturbed possession thereof." This deed was duly acknowledged and admitted to record, September 13, 1879, in said county. Elizabeth died in June, 1880, at the age of about 66, and Mary in September, 1880, at the age of about 60 years.

In January, 1885, the said Abraham C. Hale brought two separate suits in the Circuit Court of Monongalia county,—the one against Lewis C. Cole and the other against James B. Cole,—to set aside and annul the aforesaid deeds of March 8, 1879, and September 10, 1879, to the said defendants, respectively. The averments of the two bills are substantially the same, mutatis mutandis, and seek to invalidate and set aside said deeds upon two alleged grounds: first, because " the said grantors, and especially the said Elizabeth, were on account of their frailty and imbecility of body and mind wholly incapable of understanding or transacting business, and incompetent to make said deeds or dispose of their property;" and second, " that said deeds were procured by reason of such want of capacity and the undue influence exercised over them and gross fraud of the defendants, and especially was this so as to the said Elizabeth."

These bills were promptly answered by the respective defendants, each of them positively denying the said charges of imbecility or want of capacity of the grantors to make said deeds, and any fraud or undue influence in their procurement, and averring that each of said grantors, and especially the said Elizabeth, was fully competent mentally and otherwise to make said deeds or any other contracts in respect to her property real or personal.

A large volume of depositions was taken and filed by the respective parties; and on June 17, 1887, the two causes

were by consent heard together, and the court deciding that
the said Elizabeth and Mary, by their aforesaid agreement,
dated December 19, 1874, have made partition of the said
190 acres of land, whereby the said Mary, and after her death
the said Lewis C. Cole, should hold in severalty the portion
on the south side of the county road, and that the said Eliza-
beth should have the portion of said 190 acres lying on the
north side of the road, it therefore adjudged, ordered, and
decreed, that said deed of March 8, 1879, so far as it conveys
to Lewis C. Cole any portion of said 190 acres on the north
side of the road, and that the said deed of September 10,
1879, in whole be and the same are set aside and declared
null and void; but the said deed of March 8, 1879, is held
and declared to be valid as a conveyance of the land em-
braced therein on the south side of the road.

From this decree the defendants, Lewis C. and James B.
Cole, have appealed.

The appellants insist, that the court should have dismissed
both of the plaintiff's bills, and that it manifestly erred in
granting any relief whatever to the plaintiff. It may be ob-
served in the outset that the plaintiff could not in any event
inherit the interest of Mary Cole in the 190 acres of land. If
she had not conveyed her moiety during her life, it would
have been inherited by her son, the appellant, Lewis C. Cole ;
consequently the acts of Mary, in conveying her interest in
said land, which was all she did or could convey by the said
deeds of March 8, 1879, and September 10, 1879, did not in any
respect prejudice the rights of the plaintiff, A. C. Hale ; and
it necessarily follows, therefore, that whether the said acts
of Mary are valid or invalid, is wholly immaterial, so far as
the plaintiff is concerned, and he cannot be heard to complain
in either event. This makes it unnecessary to consider the
competency of Mary to execute said deeds, or whether or not
they are as to her valid conveyances.

If the plaintiff has succeeded in showing that the said deeds
are invalid as to his mother, the said Elizabeth, he can have
the land repartitioned, and his mother's moiety assigned to
him, notwithstanding the validity of said deeds as to Mary.
The only inquiries, then, which can be made in these causes,
are whether or not Elizabeth, the mother of the plaintiff, had

capacity to execute said deeds, and whether or not they were procured by the undue influence and fraud of the appellants or either of them. I have examined the mass of depositions and other evidence filed in these causes with much care, and I must confess that I am unable to find any evidence to support the decree of the Circuit Court.

The only possible theory, it seems to me, on which that decree can be based, is the one advanced by some of the witnesses for the plaintiff, and that is, that a mother, who would disinherit her only child under any circumstances, must of necessity be of unsound mind, and incapable of doing a valid act. However forceable and persuasive this theory may be, it certainly is not the law. Where legal capacity is shown to exist in the grantor, and no fraud or undue influence is shown to control the free exercise of his or her judgment or will, the validity of a deed cannot be impeached however unreasonable, imprudent or unaccountable it may seem to others. Where a grantor or testator has legal capacity to make a deed or will, he has the legal right to make an unequal, unjust or unreasonable disposition of his property. *Voluntas stat pro ratione. Jarrett* v. *Jarrett,* 11 W. Va. 584; *Couch* v. *Eastham,* 29 W. Va. 784.

All the witnesses, both those for the plaintiff and those for the defendants, who make any discrimination, accord in their testimony, that the mental and business capacity of Elizabeth was better than that of Mary. Even in reference to the latter the testimony in my judgment fails to show that degree of mental incapacity, which would disqualify her from transacting business. The most that it does show is, that she was a diffident, retiring, uneducated woman with mental capacity somewhat below the average of persons of her class; while in respect to Elizabeth the whole testimony taken together clearly shows, that she was above the average both as to mental and business capacity. It is true, some of the plaintiff's non-expert witnesses give it as their opinion, that she was deficient in mental capacity, but none of them state any acts or circumstances to justify their opinions.

One of the witnesses who attempts to give the grounds of her opinion, says that Elizabeth was sickly, and that she would take awful funny spells; and, when asked what she

did during the funny spells, say's, that sometimes she would say, " God have mercy," and sometimes that she wished she was dead; that she would talk about the graveyard; said her father and mother laid there, and that it would not be long till she would be there; that while she would be lying in bed she would jerk the covers over her head; that she got out of bed, ran out of doors in her night clothes, and kicked over a chair or two, and hollowed. This is the testimony of a hired girl who lived with these old ladies in 1875. Another hired girl living with them says, that Elizabeth complained a great deal, cried and said she wished she had not a foot of land, then she would not have any trouble. These are about all the facts given by any of the witnesses tending to impeach the capacity of Elizabeth; and these facts, frivolous and inconclusive as they are, are wholly inconsistent with and discredited by the facts and other testimony in the case.

Dr. Casselberry, the only physician who testified in behalf of the plaintiff, says: " They were both frail old ladies at that time, [in 1875.] As to their mental condition I would say this: I think they were parties that would be easily influenced by a person they had confidence in. Of course, I saw but little of these people, but from what I did see they were parties of strong prejudices when they did take a stand."

On behalf of the defendants, in addition to a number of witnesses who had known these two women many years, and testified that Elizabeth was a cautious and shrewd business woman,—above the average,—two experts who had been her attending physicians were examined, and testified that they were both of sound mind. Dr. MacLain, who attended Elizabeth in her last illness, says that she had mind and memory sufficient to transact business and dispose of her real estate rationally and understandingly up to the time of her death.

It seems to me therefore without further reviewing the testimony, that according to the facts and the great preponderance of the evidence it is not shown, that Elizabeth was incompetent mentally or otherwise to execute the deeds in question in these causes. In regard to the charge of fraud or undue influence, there is little or no testimony to sustain it.

It is shown, that some time prior to the making of the deeds to the defendants, Elizabeth had executed two wills, in which she gave one half her land to the defendant, Lewis C. Cole, and the other half to the plaintiff, A. C. Hale. It is claimed, that these wills were destroyed at the instance of the said Lewis C. Cole, And while it is shown that Lewis was desirous of having a deed rather than a will for his part of her estate, it is proven positively by letters written by him to the plaintiff at the time, that he preferred, that the plaintiff rather than the defendant, James B. Cole, should have the other half of Elizabeth's land, and that he did all that he could to influence Elizabeth to convey it to the plaintiff. He sent for the plaintiff to come to his house, and both he and the plaintiff importuned her not to let James B. have it, but to give it to the plaintiff, and she said that she had determined that Lewis should have part and James B. the residue, and that she did not want the plaintiff to worry her about it; that she had made up her mind and would not change it. This not only shows that Lewis did not want the wills destroyed in order to deprive the plaintiff of the devise to him, but it also shows that he was wholly unable to influence Elizabeth in the disposition of her property.

It is further shown that Lewis was very kind to his aunt, and by that means acquired her confidence, and it is claimed that by reason of the confidence thus acquired he could and did influence her to give him a part of her land. If this were true, as it probably is, and Elizabeth was thus influenced to give Lewis a part or the whole of her estate, it would not invalidate the conveyance. Influence obtained by acts of kindness and attention is not an undue influence; and, if a grantor or testator is by such acts influenced to convey his property or bestow a bounty, the transaction will not be invalid for that reason. *Nicholas* v. *Kershner*, 20 W. Va. 252.

It is not, as I understand it, contended that there was either such mental incapacity or undue influence or fraud in these conveyances as would be sufficient of itself to invalidate them, but that these matters, taken in connection with the fact, that this old lady has wholly disinherited her only child are sufficient to satisfy a court of conscience, that these deeds were not the voluntary acts of a free will and competent

mind. It is not questioned that, where the facts and circumstances offer no explanation, the ignoring or disinheriting of her only child would raise a strong suspicion of either mental incapacity or undue influence. But this is not a case of that character.

The facts and circumstances here fully and satisfactorily explain the conduct of the grantor. In the first place, the mother had been, without any apparent justification, deserted by the father before the plaintiff was born. When but six months old the plaintiff was by the father cruelly and unnaturally stolen from the mother, the name she had given him taken from him, and neither the plaintiff nor the father ever after lived with or cared for the mother. It is true the plaintiff, after he became nineteen or twenty years of age, occasionally visited her, and made her some trifling presents; but though for twenty-five years he lived within easy distance from her he never provided for her, or offered to live with her, or asked her to live with him. She was left alone, imbecile, weak and decrepit, as he now claims she was, to take care of herself, so far as he was concerned, among her other relations, whom he now characterizes as sordid and rapacious. She was never given the opportunity to treat him as a son during her whole life, nor did he ever attempt to act the part of a son, or treat her as a mother, until he brought these suits to get her estate.

On the other hand, the defendants were the nephews, and both of them virtually raised in the family of their aunts; they had lived with and near them all their lives; provided and cared for their wants and comfort so far as necessary up to the time of the making of the deeds complained of, and afterwards during their whole lives. There is not a particle of evidence in this whole record to show, or which tends to show, that either of the defendants ever said an unkind word, or did an unkind or ungenerous act, towards either of these old ladies; but, on the contrary, the plaintiff has attempted to show that by their kindness and faithful attention they acquired an undue influence over them. In all their conduct and communication it seems to me these two nephews acted and were treated more like the children of Elizabeth than did her own fugitive and

indifferent son, the plaintiff.  It was therefore, in my opinion, neither unjust, unnatural, nor unreasonable for her to give her little estate to them, to the exclusion of the plaintiff.

An additional reason, if one were needed, why the plaintiff is not entitled to any relief in these causes, is his laches and great delay in asserting his alleged rights.  He was fully informed of the execution of both of these conveyances before the death of his mother, yet he did not bring these suits until nearly five years after her death.  No explanation whatever is given of this long delay.  This of itself, unexplained, ought to be sufficient in a court of equity to defeat his demand.  *Trader* v. *Jarvis*, 23 W. Va. 100; *Doggett* v. *Helm*, 17 Gratt. 96.

For these reasons the decree of the Circuit Court must be reversed, and the plaintiff's bills dismissed.

REVERSED.