DONALD C. NEWELL, SR., *et al.*

*v.*

HIGH LAWN MEMORIAL PARK CO., *et al*

*and*

PRICE T. BALLARD

(No. 14353)

Decided March 25, 1980.

Rehearing Denied May 15, 1980.

W. E. *Mohler* for appellants.

*Love, Wise, Robinson & Woodroe, W. M. Woodroe, S. Clark Woodroe and Mario J. Palumbo, Frederick A. Jesser, III,* for appellees.

NEELY, CHIEF JUSTICE

Ruby Trump Ruffner died testate in Fayette County, West Virginia, on 3 October 1975 leaving the residue of her estate to St. Andrews Episcopal Church of Oak Hill, West Virginia. Approximately 21 months before her death, on 12 February 1974 she executed a "contract and escrow agreement" transferring 290 shares of her stock in High Lawn Memorial Park Company, a controlling interest, to Leonard H. Higgins, as escrow agent. The conditions of this escrow were set forth in a purported contract which was between Ruby Trump Ruffner and Price T. Ballard, the appellant.

The condition of the contract was that Mrs. Ruffner would retain the income from her stock in the cemetery business for life, but upon the death of either Price T. Ballard or Ruby Trump Ruffner, the stock would be transferred to the survivor of them. The stated consideration for this transfer was that Price T. Ballard "covenants and agrees to immediately assume the full management of said corporation and to devote such of his time to the management of said corporation as may be necessary in and about its proper operation and with a full effort towards its profitable operation." Upon the death of Mrs. Ruffner, in pursuance of this Contract and Escrow Agreement, Leonard H. Higgins, the Escrow

Agent, transferred the stock to the appellant, Price T. Ballard.[1]

---

[1] The full text of the Contract and Escrow Agreement reads as follows:

## CONTRACT

THIS CONTRACT AND AGREEMENT, Made and entered into this 12th day of February, 1974, by and between RUBY TRUMP RUFFNER, widow, party of the first part, and PRICE T. BALLARD, party of the second part:

## WITNESSETH:

THAT WHEREAS, the party of the first part is the owner of Two Hundred Ninety (290) shares of stock, the numbers of which are hereinafter listed, in High Lawn Memorial Park Company, a corporation, and

WHEREAS, the party of the first part desires to transfer unto the party of the second part said shares of stock, and any and all other shares of stock in said Company which may be hereafter issued to the party of the first part, and

WHEREAS, the party of the second part desires that said shares of stock be transferred to him, and

WHEREAS, both of the parties hereto have agreed upon a method whereby said shares of stock are to be transferred.

NOW, THEREFORE, THIS AGREEMENT FURTHER WITNESSETH:

That the said party of the first part does hereby Transfer and Set Over unto the said party of the second part Two Hundred Ninety (290) shares of stock in High Lawn Memorial Park Company, a corporation, evidenced by Certificates Numbers as follows:

*Stock Certificate No. 80 for 100 shares, High Lawn Memorial Park Company, Issued to Mrs. J. Sheldon Trump.*
*Stock Certificate No. 94 for 190 shares, High Lawn Memorial Park Company, Issued to Ruby B. Trump.*

and any and all other shares of stock in said Company which may be hereafter issued to the party of the first part herein.

In consideration of the aforesaid transfer of stock, the party of the second part convenants and agrees to immediately assume the full management of said corporation and to devote such of his time to the management of said corporation as may be necessary in and about its proper operation and with a full effort toward its profitable operation. The said party of the second part covenants and agrees for himself, his heirs, executors and assigns, that the full income from the aforesaid shares of stock shall be and is hereby retained by the party of the first part herein, for and during the term of her natural life, and hereby transfers and sets over completely and fully unto the said party of the first part said income

The trustees of St. Andrews Episcopal Church brought this lawsuit to have the Contract, Escrow Agreement,

for and during the term of the natural life of said party of the first part.

The parties hereto mutually covenant and agree that the aforesaid Two Hundred Ninety (290) shares of stock, and any and all other shares of stock in said corporation which may be hereafter issued to the party of the first part herein, shall be placed in escrow with Leonard H. Higgins and _____, as joint escrow agents to deliver all of the aforesaid shares of stock to Price T. Ballard, party of the second part herein, his heirs, executors or assigns, upon presentation to said escrow agents of a valid and proper death certificate of the party of the first part herein. Before delivery of said certificates of stock to the escrow agents designated herein, the party of the first part shall fully execute said certificates and transfer same unto the party of the second part herein by proper notation upon said certificates.

The parties hereto covenant and agree that should the party of the second part predecease the party of the first part, then all stock transferred hereunder by the party of the first part shall be re-transferred to her, and upon re-transfer should the party of the first part desire to sell said stock, then she covenants and agrees that the stock of the party of the second part shall be sold at the same time and for the same price, with the proceeds thereof to be paid to the heirs or devisees of the party of the second part.

Each of the parties hereto covenant and agree that this agreement as well as any escrow agreement between the parties shall be binding upon each of the parties hereto, their heirs, executors and assigns.

WITNESS the following signatures and seals:

| Ruby Trump Ruffner | (SEAL) |
| Ruby Trump Ruffner | |
| Price T. Ballard | (SEAL) |
| Price T. Ballard | |

STATE OF WEST VIRGINIA,

COUNTY OF FAYETTE, to-wit:

I, __Vera Andrew Easton__, a Notary Public in and for the said County and State, do hereby certify that RUBY TRUMP RUFFNER, widow, and PRICE T. BALLARD, whose names are signed to the above writing, bearing date the 12th day of February, 1974, have this day acknowledged the same before me in my said County and State.

and transfer of stock set aside. After hearing all of the evidence and the arguments of counsel, the jury returned a verdict in favor of the plantiffs, the Trustees of St. Andrews Episcopal Church, and against the appel-

---

Given under my hand this *12th* day of February, 1974.
My Commission expires June 29, 1977

Vera Andrew Easton
NOTARY PUBLIC

*ESCROW AGREEMENT*

Oak Hill, W. Va.
February 12, 1974

TO:   Leonard H. Higgins and

_____,
as Escrow Agents:

I, Ruby Trump Ruffner, hereby hand you the following documents:

*Stock Certificate No. 80 for 100 shares, High Lawn Memorial Park Company, Issued to Mrs. J. Sheldon Trump.*
*Stock Certificate No. 94 for 190 shares, High Lawn Memorial Park Company, Issued to Ruby B. Trump.*

These documents are to be held by you in escrow under the following instructions:

1. Upon the presentation to you of a valid and proper certificate of the death of myself, Ruby Trump Ruffner, you are to deliver the aforesaid documents to the undersigned, Price T. Ballard, his heirs, executors or assigns. You are further instructed upon the presentation to you of a valid and proper certificate of death of Price T. Ballard before the death of Ruby Trump Ruffner to deliver the aforesaid documents to Ruby Trump Ruffner.

2. You are further instructed that said certificates of stock above described may be delivered jointly to the undersigned upon their joint written request at any time before the death of the undersigned.

This escrow agreement is made in relation to that certain contract between the undersigned, dated the 12th day of February, 1974, wherein the undersigned, Ruby Trump Ruffner, is party of the first part, and the undersigned, Price T. Ballard, is party of the second part.

Ruby Trump Ruffner
Ruby Trump Ruffner

Price T. Ballard
Price T. Ballard

lant. At the trial, the evidence indicated that Mrs. Trump (the name she used after the death of her second husband), had relied upon others to advise her in the management of her business affairs all her life. In her later years she depended upon the appellant for advice on her business matters, and he assumed management of the cemetery, High Lawn Memorial Park Company. While maintaining a facade of independence to the point of eccentricity towards the rest of the world, Mrs. Trump reposed confidence in Mr. Ballard to such an extent that she relied upon his opinions in the smallest matters.

It is argued by the appellees that by virtue of Mrs. Trumps's dependence upon Mr. Ballard there arose a "confidential relationship" which placed Mr. Ballard in the position of a fiduciary. The appellees argue that this confidential relationship demanded that the appellant exercise the utmost fairness and impartiality in his dealings with Mrs. Trump; however, Mr. Ballard is not a lawyer and did not exercise any official fiduciary capacity such as executor or administrator. The evidence demonstrates that Mr. Ballard was at most a close friend and an employee of a corporation in which Mrs. Trump owned the controlling interest. While the record does not reveal the ages of either Mrs. Trump or Mr. Ballard at the time this transaction was completed, oral argument before this Court indicated that Mrs. Trump was in her early sixties and Mr. Ballard was in his late fifties.

The plaintiff-appellees successfully maintained below that while under the sway of the alleged confidential relationship Mrs. Trump executed the Contract and Escrow Agreement with the appellant and that her trans-

---

We hereby acknowledge the receipt by us of the documents above listed and agree to perform and abide by the instructions above set out.

Leonard H. Higgins
Leonard H. Higgins

fer of the stock was exacted from her by the use of undue influence and was based upon no consideration. At the trial Mr. Ballard admitted that he gave nothing for the stock transfer because his duties with the cemetery both before and after the execution of the contract were essentially the same; however, the evidence also indicates that Mr. Ballard was a free agent and that the business activity of the cemetery improved dramatically under his management.

The case before us involves this purported contract; however, the facts surrounding its execution lead the Court to conclude that the instrument has attributes of a contract, a gift, and a trust. An example of the confusion of legal principles which the facts of this case invite is that the case was tried in the lower court on a contract theory, but the doctrine sought to void the contract was that of "undue influence," an equitable principle which is applied almost exclusively to gifts and wills. Cases like the one before us impale the legal mind because the law creates certain categories, most of which have evolved over hundreds of years, and legal questions are expected to fit in one or another of them. Therefore, today, we find a set of round holes into which we are expected to squeeze an equal number of square pegs.

I

The first legal category which threatens our analysis of this case is that of "contract." While the Agreement between the parties was styled a "contract," the entire foundation of this lawsuit would have been decimated if the legal instrument involved had been styled "deed of conditional gift," "deed of gift," or "trust." The record discloses a very close friendship between Mrs. Trump and Mr. Ballard, and it is obvious from all the circumstances surrounding this transaction that what Mrs. Trump intended to do was to make a conditional gift to Mr. Ballard dependent upon his continued management of the affairs of the company. It is also obvious from the record that an implicit part of this contract was that Mr.

Ballard would continue his personal attentions towards Mrs. Trump.

The Contract and Escrow Agreement in question were prepared by Mr. Ballard's attorney, but it was also undisputed that Mrs. Trump took the papers to her own attorney and sought his independent advice with regard to the transaction without the interference of Mr. Ballard. While Mrs. Trump was on the border of retirement age, and she depended upon the advice of a series of men, nonetheless, she exercised substantial independent judgment.[2] The stated consideration in the contract was that Mr. Ballard would "immediately assume the full management of said corporation" and it is not disputed that he continued a course of vigorous management. We cannot find as a matter of law that there was no consideration since Mr. Ballard, though already an employee of the corporation, could have withdrawn from the management at any time. While the consideration on Mrs. Trump's side was somewhat disproportionate, there was definitely some consideration, as a matter of law, on Mr. Ballard's side.

The doctrine of failure of consideration in the law of contracts is certainly a nebulous one; cases can be found where the slightest consideration is adequate to support

---

[2] The record disclosed that one witness, Vera Easton, believed that Mrs. Trump was under the force or undue influence of Mr. Ballard at the time the contract was executed. On the other hand, most of the witnesses stressed that Mrs. Trump was a woman who had a strong mind. For example, Mr. Cook testified that "Ruby herself was headstrong, or had a will of her own in generally everything that she did"; Velma Bowling testified that "Ruby, in my estimation, had a strong will of her own and I don't think any one could have dominated Ruby"; Charles Young testified "I would consider her a right strong-willed person"; Jerry Epperly testified that "she was very strong-willed"; Mildred Ferrell testified she was "a very strong willed person", Kaye Ballard testified "she was a very strong-willed person. She knew what she wanted and she proceeded to accomplish it"; Nell Dickinson testified "I always considered her a rather strong-willed person"; and Nancy Wiseman testified that "I don't think Jesus Christ could have changed her opinion when she made her mind up."

a contract[3] while others can be found in which substantial consideration has been held to be "insufficient."[4] The doctrine finds its counterpart in the *Uniform Commercial Code* provision on unconscionability where the learned commentators on that section are slightly more candid in addressing the inherently subjective nature of the process by which courts review bargains made by individuals.[5]

---

[3] *Ravencliff Development Co. v. Lafferty*, 103 W.Va. 539, 138 S.E. 104 (1927); *McCary v. Monongahela Valley Traction Co.*, 97 W.Va. 306, 125 S.E. 92 (1924); *Hornbrooks v. Lucas*, 24 W.Va. 493 (1884); see "The Peppercorn Theory and the Reinstatement of Contracts", 10 Wm. and Mary L. Rev. 201 (1968).

[4] *Hopkins v. Wilkinson*, 115 W.Va. 32, 174 S.E. 564, (1934), *Cox v. Davis*, 85 W.Va. 604, 102 S.E. 236 (1920).

[5] The applicable section in *W.Va. Code*, 46-2-302 [1963] reads in pertinent part:

(1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

(2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination.

OFFICIAL COMMENT

*Prior uniform statutory provision:*
None.

*Purposes:*
1. This section is intended to make it possible for the courts to police explicitly against the contracts or clauses which they find to be unconscionable. In the past such policing has been accomplished by adverse construction of language, by manipulation of the rules of offer and acceptance or by determinations that the clause is contrary to public policy or to the dominant purpose of the contract. This section is intended to allow the court to pass directly on the unconscionability of the contract or particular clause therein and to make a conclusion of law as to its unconscionability. The basic test is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are

It is both very ancient and very good law that friendship alone, no matter how meretricious its overtones, cannot lead to an inference of undue influence. The subject was quite adequately handled during the Chancellorship of Lord Talbot in the case of *Cray v. Rooke,* [1735] Cas. Eq. Tempore Talbot (Cur. Ch) 153, where his Lordship held that a bond given to a mistress at the time a man contracted for his own marriage with another woman, for the maintenance of the mistress and her child, was *premium pudoris* and as such could not be set aside for the heirs but must be paid from the man's estate.

*Cray v. Rooke, supra* is peculiarly dispositive of the issue before us since from the record in our own case it appears there was an element of romance between the appellant and Mrs. Trump. If Chancellor Talbot found such a meretricious relationship between benefactor and mistress sufficient to support a contract for maintenance in 1735, we must say that the relationship between Mrs. Trump and Mr. Ballard is sufficient to support a comparable contract in 1980. While it might be argued that *Cray v. Rooke* should be distinguished from the case *sub judice* by the absence, in our own case, of the element of *premium pudicitiae,* (as distinguished from *"pudoris"*) we find the element of chastity *per se* superfluous, particularly since the maintenance contract of *Cray* was made *after* the seduction. Thus, the real principle of *Cray* which instructs our understanding of the ancient law in these matters, and which has made the case notable through the centuries, is that a meretricious consideration is, nonetheless, a consideration. Consequently, on the question of failure of consideration the appellant was entitled to judgment.

so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract. Subsection (2) makes it clear that it is proper for the court to hear evidence upon these questions. The principle is one of the prevention of oppression and unfair surprise. (Cf. Campbell Soup Co. v. Wentz, 172 F.2d 80, 3d Cir. 1948) and not of disturbance of allocation of risks because of superior bargaining power.

## II

We must now address the question of whether there was any factual basis from which a jury could infer undue influence. Mrs. Trump did not live with Mr. Ballard and had many opportunities to consult with other people, including her lawyer, about anything which Mr. Ballard suggested. A jury is not entitled to find undue influence from any relationship which offends their sensibilities. The doctrine of undue influence is usually invoked (but seldom applied by the courts) in instances where an individual has succeeded in directing the assets of an estate away from the natural objects of a testator's affection, such as wife, children, grandchildren, or other near relatives.[6] Sometimes one individual who is a natural object of affection succeeds in directing all of the assets of an estate to himself,[7] and sometimes a total stranger has been successful in directing all assets away from the natural objects of affection to himself.[8]

---

[6] *Frye v. Norton,* 148 W.Va. 500, 135 S.E. 2d 603 (1964) (bequest to lawyer excluding first cousin not result of undue influence); *Ritz v. Kingdon,* 139 W.Va. 189, 79 S.E.2d 123 (1953), *overruled on other grounds,* in *State v. Brag,* 140 W.Va. 585, 87 S.E.2d 689 (1955) (bequest to sister excluding another sister and several nieces not result of undue influence); *Orum v. Rose,* 74 W.Va. 164, 81 S.E. 719 (1914) (deed given to one daughter excluding other children not result of undue influence); *Teter v. Teter,* 59 W.Va. 449, 53 S.E. 779 (1906) (deed given to wife and daughter excluding other children not result of undue influence); *Hale v. Cole,* 31 W.Va. 576, 8 S.E. 516 (1888) (deed given to two nephews excluding son not result of undue influence).

[7] Our research revealed very few instances in which the Court found undue influence sufficient to void the disposition. In *Turner v. Hinchman,* 72 W.Va. 384, 79 S.E. 18 (1912), an 88 year old man deeded all his property to two sons in whom he had placed the responsibility of transacting his business, excluding his four daughters. It seems that the two brothers, one of whom was supposed to protect the daughters' interests, joined together to deprive the daughters. Even in this instance of fraud the Court strained to gain a bare 3-2 majority. *See, Arnold v. Arnold,* 11 W.Va. 449 (1877); *Deem v. Phillips,* 5 W. Va. 168 (1872).

[8] In one instance the benefactress willed all her property to a "stranger in blood" who had taken care of her. While acknowledg-

Where, however, is there room for the doctrine of undue influence in the case before us when there are no natural objects of affection which were deprived by Mr. Ballard? Mrs. Trump's will was meticulously drawn a year and four months after the Contract and Escrow Agreement were executed and the appellant, Prince T. Ballard, received no devise or bequest under that will. Mrs. Trump left numerous bequests to her friends, provided for the college education of a Miss Christine Daniels, and then disposed of the rest of her property to St. Andrews Episcopal Church. There is no more reason for this Court to believe that St. Andrews Episcopal Church was a natural object of Mrs. Trump's affection than that Price T. Ballard was a natural object of her affection. Mr. Ballard was Mrs. Trump's friend and there is no evidence in the record that he held any "confidential relationship" in excess of friendship.[9] We refuse to penalize either friendship or its legitimate rewards.[10]

---

ing that the exclusion of her heirs at law was an unnatural disposition, Judge Brannon, writing for a unanimous Court, was guided by the ancient principle that "[c]ourts must be cautious how they deny to the owners of property the full right of disposition. The law gives to the owner absolute dominion over it, and full—indeed, arbitrary—power of disposition; and this right is, under the law, sacred, next to the right to life and liberty." *Stewart v. Lyons*, 54 W.Va. 665, 47 S.E. 442, 445 (1903). Brannon later observed that her will was eminently reasonable since "[t]o whom more probably, more reasonably, than to Stewart, who loved her, visited her, expressed warm affection for her when others were cold, and who, as she certifies in her will, befriended and accommodated her?" *Id.* at 54 W.Va. 673, 47 S.E. at 445.

[9] The appellees place great weight upon the decision in *Summers v. Ort*, 112 W. Va. 129, 163 S.E. 854 (1932), which held that if a confidential relationship were established then any undue influence might be sufficient to destroy the contract. While the appellees consider this a landmark decision, in fact it was an anomaly that was never cited again in any decision by our Court for any proposition. Two years after this case, our Court found in another case that even though the beneficiary had been given a limited power of attorney by the benefactor, that did not establish a confidential relationship even though he received greater benefits than certain heirs at law. *Mullens v. Lilly*, 123 W.Va. 182, 13 S.E.2d 634 (1934).

[10] Our Court has consistently held that influence acquired by reason of acts of kindness and attention, or love and affection do

Elderly people are frequently lonely and frequently find that their property gives them, for one reason or another, an opportunity to engage in human contact. Mrs. Trump undoubtedly understood the terrors of old age which Robert Frost succinctly memorialized in "Provide, Provide":

The witch that came (the withered hag)
To wash the steps with pail and rag,
Was once the beauty Abishag,
The picture pride of Hollywood.
Too many fall from great and good
For you to doubt the likelihood.
Die early and avoid the fate.
Or if predestined to die late,
Make up your mind to die in state.
Make the whole stock exchange your own!
If need be occupy a throne,
Where nobody can call *you* crone.
Some have relied on what they knew;
Others on being simply true.
What worked for them might work for you.
No memory of having starred
Atones for later disregard,
Or keeps the end from being hard.
Better to go down dignified
With boughten friendship at your side
Than none at all. Provide, provide!

Mrs. Trump was also competent enough to have learned the lesson of King Lear, namely that once the property is gone the solicitous attention of others may be gone as well. She retained a certain control over the property by virtue of the Escrow Agreement in order to guarantee herself Mr. Ballard's continued affection. In this regard she was successful, as the evidence discloses that Mr. Ballard was faithful to her until the time of her death. Consequently, it would be most unfair to deny Mr. Ballard the bounty which Mrs. Trump legitimately sought to bestow upon him, and as a matter of law, the appel-

---

not constitute fraud or undue influence. *Delaplain v. Grubb*, 44 W.Va. 612, 30 S.E. 201 (1898); *Hale v. Cole*, 31 W.Va. 576, 8 S.E. 516 (1888).

lees were not entitled to the instruction on undue influence.[11]

Since, as a matter of law, the appellees were not entitled to have the jury instructed on either of their theories of the case, the Circuit Court erred in failing to direct a verdict for the appellant and the judgment of the Circuit Court of Fayette County is reversed and the case is remanded with directions to enter judgment for the appellant.

*Reversed and remanded.*

---

[11] The plaintiffs' undue influence instruction number six (as amended) read as follows:

The Court instructs the jury that undue influence can seldom be proven by direct testimony for such influences are usually covert and probable only by circumstances, and the jury can draw any reasonable inferences which are fairly deducible from all the facts and circumstances which have been established to their satisfaction by a preponderance of the evidence. If the jury believe from the evidence and under all the instructions of the court that undue influence induced the execution of the contract and escrow agreement, they may find against their validity.