# CHARLESTON.

IDA HICKS et al. v. NEW RIVER & POCAHONTAS CONS. COAL CO.

Submitted October 23, 1923. Decided November 13, 1923.

1. EJECTMENT—If Court Compelled to Set Aside Verdict for Plaintiff, One May be Directed for Defendant.

   If on the trial of title to land the court would be compelled to set aside a verdict for the plaintiff, a verdict may be directed for defendant. (p. 18).

2. SAME—Description of Land in Declaration Held Sufficient.

   A declaration in ejectment which describes the land sued for as "being one acre reserved out of said tract and on the northeast end of said tract and begins at the county road where the tract crosses said road and then running down the road far enough to get an acre of said tract by running up the hillside to the outside boundary line of the said tract, and then with said line to the beginning," is not bad on demurrer for failing to comply with section 8, chapter 90 of the Code. (p. 19).

3. TRIAL—Mere Scintilla of Evidence Not Sufficient to Require Submission to Jury; Where Verdict Cannot Stand on Evidence, Court May Properly Direct for Party Against Whom Offered.

   To call peremptorily for the submission of an issue to the jury, it is not sufficient that there be a mere scintilla of evidence supporting it; and if the court would not allow a verdict to stand thereon, it may properly direct a verdict for the party against whom the evidence is offered. (p. 20).

4. EJECTMENT—Where Impossible to Locate Land in Declaration, Court May Properly Direct Verdict for Defendant.

   Where it is impossible to locate on the ground the land described in the declaration and the rights of the parties depend thereon, plaintiff must fail of any recovery, and the court may properly direct a verdict for defendant. (p. 21).

5. SAME—Location of Land in Declaration Held Question of Law.

   Where in ejectment the land sued for and the plaintiff's title papers call for a lot located in the northeast end of the tract out of which it was reserved, and there is such a locality in the larger tract, and there is nothing in the record of the deeds or other evidence justifying the location thereof at any other point, the question of the construction of the deed is one of law for the court and not of fact for the jury. (p. 31).

6.  APPEAL AND ERROR—*Judgment not Reversed for Failure of Jury to Find Interest of Plaintiff, Where Verdict Directed for Defendant.*

    When in such suit, the court in directing a verdict for the defendant, further directs them to find that the lot of plaintiff is at another location than the one sued for, and the jury fails to find the estate or interest of the plaintiff in the lot as so located, the error, if any, is harmless, and for which the judgment on the verdict will not be reversed.     (p. 31).

7.  COSTS—*Defendant, Substantially Prevailing, Entitled to Recover of Plaintiff His Costs.*

    When in such a suit the defendant substantially prevails, he is entitled to recover of plaintiff his costs.     (p. 32).

Error to Circuit Court, McDowell County.

Action by Ida Hicks and others against the New River & Pocahontas Consolidated Coal Company. Judgment for defendant, and plaintiffs bring error.

*Affirmed.*

*George W. Howard* and *Strother, Taylor & Taylor,* for plaintiffs in error.

*Chapman, Peery & Buchanan* and *Strother, Sale, Curd & Tucker,* for defendant in error.

MILLER, PRESIDENT :

In ejectment, after all the evidence on both sides was in, the court below, on motion of defendant, in effect directed a verdict in its favor and pronounced the judgment now under review.

The controlling question presented is whether, on the state of the pleading and evidence, the court should have so ordered: The rule now firmly established by our decisions is that if the court would be compelled to set aside a verdict in favor of the opposite party, a verdict in accordance with the plain preponderance of the evidence should be directed. *Ice* v. *County Court,* 77 W. Va. 152; *Owen* v. *Appalachian Power Co.,* 78 W. Va. 596; *Bank* v. *Lowry & Co.,* 79 W. Va. 10. And the converse of this proposition is equally true, that the court should not direct a verdict against a party when

the evidence in the case would justify a verdict in his favor. *Hunter* v. *Johnson*, 76 W. Va. 154; *Bank* v. *Lowry & Co.*, *supra.*

As described in the declaration the property sued for was "an estate in fee simple absolute, of a certain tract or parcel of land lying and being in the county of McDowell aforesaid, and containing one acre, less a small portion thereof which had been sold to the Iaeger and Southern Railroad Company, and which is described in a certain paper writing conveying the same, the said acre being bounded and described as follows, being a part of a tract of land conveyed by W. P. Payne and wife to Henry and Jessie Beavers, by deed dated August 1, 1898, recorded in the office of the Clerk of the County Court of McDowell County, West Virginia, in Deed Book No. 23, at page 276, that is to say, being one acre *and on the northeast end of said tract and begins at the county road where the tract crosses said road and then running down the road far enough to get an acre of the said tract by running up the hillside to the outside boundary line of the said tract, and then with said line to the beginning."* The deed from Payne and wife referred to, which was introduced in evidence, describes the one acre excepted substantially as described in the declaration, and as described also in the deed from Payne and wife to D. H. Harman, Jr., the ancestor of plaintiffs.

The evidence shows that plaintiffs and defendant claim under a common source of title, and there is therefore no conflict of title to the land in question. The question is simply and solely as to the true location of the lot sued for.

The defendant interposed a demurrer to the declaration, basing it on section 8 of chapter 90 of the Code, relating to ejectment, requiring that "the premises claimed shall be described in the declaration with convenient certainty, so that from such description possession thereof may be delivered." It is said in argument that the description in the declaration is of an acre of land less an undescribed and unidentified part of it. It is said that the beginning point, so far as the description is concerned, might be located at one or more of a half dozen different places, at or along the road referred to, and that conceding the beginning point to be where plain-

tiff would have it, even then the description is not one of convenient certainty, because the line running down the road might be 100 or 500 feet, then up the hill to the outside boundary line, so as to include one acre of ground; and this is conceded to be a fact by all the witnesses for plaintiff, including their surveyors and engineers. We do not think we ought to say that the description is so uncertain as to render the declaration bad on demurrer. The land sued for is a lot purporting to have been reserved or excepted out of a larger tract conveyed by Payne and wife to Beavers by deed referred to and described in the declaration. It was held by us in *Carter* v. *C. & O. Ry. Co.*, 26 W. Va. 644, that the declaration was not bad on demurrer which described the premises as "a certain lot of land lying in the town of Ronceverte, in the county aforesaid, being the piece of land near the railroad depot in said town, upon which the defendant has erected a pump-house and appliances for the purpose of supplying its engines with water." However, as the merits of the case involve questions, not only of the certainty of description, but the actual location of the land, we need not further consider the sufficiency of the declaration on demurrer. As intimated, however, we think it good, and substantially complying with the requirement of the statute; but as the verdict directed was in favor of defendant, we need not further consider this cross-assignment of error.

The first ground relied on by plaintiff to reverse the judgment is that the court below directed the jury to find that the true location of the acre sued for was as claimed by defendant and as laid down on the plat made by C. A. Bailey, engineer, and particularly described in the verdict, and that defendant did not unlawfully withhold the same from plaintiffs except a small portion thereof covered by part of a washhouse as shown on said map.

If the view which the court evidently took of the evidence is the correct one, it would have been justified in peremptorily directing the jury, on defendant's motion, to find for defendant. The course which the court took in directing the court to find that the true location of plaintiffs' land was as located by defendant and laid down on Bailey's map, is, to

say the least, rather novel practice. The purpose of the court evidently was to settle the controversy for all time; but if on the whole evidence and the view which the court took of it, the plaintiffs failed to identify and locate their lot as claimed by them and sought to be delineated on the ground by their surveyors and witnesses; the error or irregularity in the proceeding would be harmless so far as plaintiffs are concerned.

The real question before us then is, was the court justified on the state of the evidence in directing a verdict for defendant, which is the legal effect of what the court actually did, so far as the parties hereto are concerned? To determine this question it is necessary to refer as briefly as possible to the evidence in the case. And first, with reference to the title papers, they show that the acre of ground in controversy was originally a part of the J. T. Myers tract, and particularly of lot number 4 as laid off to Jessie Beavers in the partition of the Myers tract, containing 58.8 acres. This lot number 4 laid in a northeast and southwest direction, the northerly line running S. 59° 37′ W. about 2818 feet, and the southern line S. 70° 37′ W. about 2955 feet, the southwestern line called for S. 12° 30′ E. 570 feet, and the extreme eastern lines N. 52° 30′ W. 910 feet, and N. 28° 34′ E. 510 feet, intersecting each other at a small hickory called for. At the time the deed from Payne and wife to the Beavers was made there had been sold off this lot number 4, at the southeastern end thereof, some 21.8 acres, leaving a 37 acre tract out of which the one acre tract was intended to be reserved, the residue whereof is now shown to be the property of the defendant company, and on which it had erected some five or six miners' houses, of which four are now within the boundary of the lot claimed by plaintiffs, and which entire tract is traversed from north to south by the Norfolk and Western Railway, surveyed, according to defendant's witnesses, about September, 1902; and defendant company obtained title to this tract from Thomas Fisher and wife October 7, 1907, and thereafter took possession and built and constructed thereon its miners' houses, of which it seems to have had possession ever since. The plaintiffs, in their effort to locate the one acre of land sued for, introduced two principal witnesses, namely, L. A.

Osborn and W. T. Tabor, engineers and surveyors. The testimony of the other witnesses relates mainly to their recollection as to the location of the county road or county roads through the Beavers tract in the vicinity of the supposed one acre tract. We will refer first to the testimony of surveyors. The witness Osborn did not claim to have undertaken to locate the one acre lot by actual survey done by him with reference to the title papers. He simply went on the ground and checked up the survey from notes made by an employee in his office, a Mr. Highberger; and according to those notes Highberger had undertaken to locate an acre of ground not literally in the northeastern end of the tract, but in the southeast corner, starting for a beginning point at a stake claimed to be on no road then existing, but described on the plat as ''County Road Abandoned'', thence along the alleged county road north, passing two other stakes in said road, to another point far enough to include an acre between this road and the southeast line of the original tract, running north 70° 37' east 229 feet, and the line parallel to it, both terminating in the outside southeast line of said orginal tract running from the hickory S. 28° 34' W. 510 poles. In doing this work Osborn swears that he started at a point at the hickory on the hill side, corner to the 58.8 acres, but that he did not make any survey himself, but simply checked up the survey made by Highberger, and located the lot as claimed by plaintiffs; did just what plaintiffs' attorney, Mr. Marvin Taylor, told him to do, and that if he had been told by Mr. Taylor to locate the lot on the top of the mountain, he would have done so. He does say that on that occasion he had copies of deeds, and that the hickory was pointed out to him as the beginning corner of the 58.8 acre tract, by Mr. Taylor. On cross-examination he admitted that two ways might be employed in laying off the lot as plaintiffs claim; one by running a line slanting up the hill, and the other by running it straight up the hill, as indicated by the map or plat made by him; that in undertaking to locate the lot strictly according to the calls in the deed, up the hill far enough to include one care, it would be more correct to run the line straight up the hill than slanting as Highberger had done; and when asked the direct question

as to whether either of these locations was the correct one called for in the deed, his answer was: "I am unable to say whether it is or not." He admitted that one of the controlling factors in undertaking to locate the lot was the call in the deed for the northeast end of the 37 acre tract remaining after the 21.8 acres had been cut off, and that another controlling factor would be the call for the county road, of which he saw no signs; and then being referred to the description in the deed as his guide, he was asked: "I say, if you had gone there and taken that description as your guide, would you have located the acre on your tracing as you have?" Ans.: "I don't think I would have located it any place from that description." Question: "I am saying, if you had taken this description?" Ans.: "I wouldn't have located it at any place; it is impossible." Question: "As a matter of fact, if you had gone there and located it with the deed as your guide, you would have located it in the northeast end, wouldn't you?" Ans.: "I would have said it laid in the northeast end but it would have been impossible to locate it anywhere from this description." Question: "And as a matter of fact, the location you show on your map isn't in the northeastern end of the tract?" Ans.: "No, sir."

The witness Tabor had lived in McDowell County from 1889 to 1918, and was familiar with the location of the county roads at the mouth of Cane Brake and up Dry Fork; and he undertook to say from recollection that the old county road in 1898 ran between the miners' houses and the river, and said that that road might possibly now be in the river since the flood of 1901. He says he traveled the road in 1889, 1900 and 1901 a number of times; that he was present when Highberger made his survey and pointed out to him the lines and old roads according to his recollection, and that Highberger started at the point where he showed him. He said that he had made a survey of this one acre of land either in 1919 or 1920, but that it might have been earlier. Being referred to a small map and asked if he had made it, he said he had, and that the survey was made in 1917; that he started at a small hickory, and ran the line S. 38° 24' to a stake, and then ran the line across Dry Fork river and made the survey

down the county road far enough to get an acre, making parallel lines; that this time he found miners' houses within the boundary located by him; and in his opinion he had made a correct survey of the lot. On cross-examination he was compelled to say that in locating the acre in 1917, he had done so somewhat arbitrarily, because there was a question in his mind whether it should be a right angle or a parallel line across Dry Fork River. He was then asked if he was able ''to tell the jury now which would be a proper and definite and positive location,'' he answered: ''I think according to the rules of surveying, a right angle would be the correct line, because it would be the shortest distance between two points.'' When asked whether he had changed his opinion, he said: ''No, I haven't changed my opinion; it is undecided in my mind which will be correct yet.'' When asked whether the correct way to run the line to describe the one acre was not the shortest line, he said: ''Possibly it might be.'' Question: ''In other words, you don't know the correct way to run that line?'' Ans.? ''No, sir.'' Question: ''And nobody else does?'' Ans.: ''I don't think so.'' And further questioned by court and counsel, the witness said: Question: ''If you begin down at the county road, how do you get up there?'' Ans.: ''You can't do it.'' Question: ''You couldn't take the calls in the declaration or deed and close that survey, could you?'' Ans.: ''Not in this declaration, no, sir.''

In further support of plaintiffs' theory that this lot bordered on the supposed abandoned county road, as laid down on Osborn's plat, they introduced a number of witnesses claiming to be more or less familiar with the roads in that vicinity as they were located about the year 1898, when the deed from Payne and wife to Henry and Jessie Beavers was made reserving the one acre now contended for; all of whom undertook to say with more or less certainty that at that time the county road running up and down Dry Fork ran close to the bank between it and the location of the miners' houses, and not between the miners' houses and the railroad as now located. It is admitted that there is no county road between those houses and the river bank at the present time. One or two of the witnesses testify that there are some evi-

dences of this road remaining some distance up the river and
beyond the miners' houses. A number of them refer to a
flood, said to have occurred in 1901, which washed away the
supposed old road, or most of it, in the vicinity of the lot
sued for, and that thereafter a part of the road at least was
in the river or river bed. Some of the witnesses lived from
two to four miles away from the property; some claimed to
have traveled the road intermittently for several years, some
more frequently. Two or more of them were mere children
in 1898. There were some seven or eight of these witnesses
as to the supposed location of the old road. The purpose
of this evidence was of course to strengthen plaintiffs' theory
that the road called for in plaintiffs' title papers was this
supposed old abandoned road.

The defendant, on the other hand, introduced first a wit-
ness Bailey, civil engineer and surveyor, who in 1895, accord-
ing to his evidence, made the partition of the J. T. Myers
land, and was at the time of his testimony and since the
year 1902 in the employ of the defendant coal company, and
had for many years been familiar with the lands in and
about the property in controversy, and also with the deeds
and title papers of other lands in the same vicinity. Prior
to 1895, when he made the partition of the Myers tract, he
was living on Jacob's Fork, about east of Dry Fork. He
testifies that he was some three weeks in making this parti-
tion, and traveled backwards and forwards to Jacob's Fork
by this land, down Cane Brake Branch to the county road to
that point; and his description of the county road as it then
existed, is that it came down Cane Brake Branch to within
three or four hundred feet of the mouth on the right hand
side as you go down, and when it got near the Myers house,
about the base of the hill, the road leading up Dry Fork
switched right around the base of the hill and around an
old barn lot, having apple trees and enclosed by a fence, and
into the other road near the foot of the hill about three
hundred feet from Cane Brake Branch. The barn lot, he said,
belonged to the Myers estate, the Myers house being on the
right hand side, the barn being directly opposite on the left
hand side; that the general shape of the barn lot was tri-
angular; and that the road passed along on the upper side of

the barn lot at the base of the hill; that in 1902 he made a survey of the ground for the purpose of developing the property in that section, and that in doing the work he made a map and actually laid down the road; and by reference to this map he pointed out to the jury the location, and swears that in 1901 the flood had not changed the road as so surveyed, but that in 1902 it remained as before the flood. The miners' houses were not located on this map or plat, but the witness designated their location on a copy of the plat filed with his evidence, and as shown on a blue-print thereof, marked "Exhibit No. 1" with his testimony. He further testified that the road down Cane Brake Branch passing the barn lot and hill side was a continuous road connecting with the Dry Fork road. In explanation of his map and his location of the lot on the plat referred to in the verdict of the jury, he says that the county road as located thereon is not exactly as it was when he originally surveyed out the Myers tract, except from miner's house number 461 on, that from there on the road is laid down as it was in 1898; that between that house and where the road down Cane Brake enters the road up Dry Fork, the road had been shifted some fifteen feet west towards the river. And he further testifies that in running the lines of the original Jessie Beavers tract from the hickory in locating the plaintiffs' lot in the extreme end of the tract, he began at a small hickory, thence N. 52° 14′ W. 162 feet to a point marked "Nail" on his map. He had stopped at that point and had not gone to the present location of the county road because the railroad had in 1905 located the beginning corner at the end of a 162 foot line and because 162 feet carried him to where the old road was located in 1898; that there is a deep railroad fill on this exact spot and that it was difficult to locate, the exact spot being then under about a ten foot fill which continues on to the railroad bridge across Cane Brake Branch; that from that point up Dry Fork there is a spring located on this map which was there in 1905 when he surveyed the Myers tract, at the upper side of the old road; that the elevation at the point where the line from the hickory strikes the county road is 1555 feet, and at the southwest corner of the lot as platted the elevation is 1532.6 feet, showing a drop

of 22 feet in 269 feet, or a grade of about 8% from the northwest corner of the lot as platted answering the call in the plaintiffs' deed for running down the road; that in 1898 when he made the survey of the Myers tract the road down Cane Brake was a well traveled one and the only road that pedestrians used in' going up and down Dry Fork, and the only road he ever saw.  He further says that after the construction of the railroad and coal works and miners' houses, there was a road along the river, and that even before 1906 and 1907, one Tom Johnson had built a tram road, which was used only about a year and was taken out, and that it was traveled as a road—that is the place where the tram road had been; that prior to that, back in 1895, he did not think there was anything there indicating a road; and that before that there was a thicket of briers, bushes and some laurel along the bank of the river.

Another of defendant's witnesses, a surveyor, A. L. Johnson, sent on the land by Bailey under the order of survey, showed he had surveyed out the one acre lot according to the corners pointed out to him by Bailey and according to the railroad map.  He began at the hickory at the northeast corner and ran in a northwesterly direction, N. 53° 30' W. 162 feet, and from there S. 28° 48' W. 269 feet, thence S. 52° 30' E. back to the intersection of the line S. 28° 40' W., thence by that line to the hickory.  After reading the description of the lot from the deed from Payne and wife to Henry and Jessie Beavers, he gave it from his experience that the acre as laid down on the Bailey plat most nearly corresponds with the description in that deed.

Another witness for defendant, J. R. Gildersleeve, a civil engineer and land surveyor since 1901, says that the first time he was ever on the land was in 1898.  He remembered the Myers house and the barn lot, its triangular shape, and that the road down Cane Brake to Dry Fork was on the east side of this barn lot, between the lot and the hill.  He knows the location of the miners' houses; was there in October before the trial; and says that the road up Dry Fork ran east of those houses in 1898.  This witness says that he spent considerable time in the vicinity of this property in 1901 and 1902; that he stayed at the Myers house four months.  This

was after the flood of 1901. He remembers the road then, and that there was a swamp in there about where the miners' houses are now located, and that the roads then were about as located on his map. And in running out the one acre lot, undertaking to locate it according to the papers, he began at the hickory, as did Bailey and Johnson, and ran substantially the same distance on the same line to the point in the public road, or to where the old road was to the best of his knowledge, which was the road that ran between the miners' houses and the hill, and says to the best of his recollection there was no road along Dry Fork between the houses and the river in 1898. His recollection is that that section was in weeds and laurel. He identifies the old road as one running between the barn lot and the hill, as do the other witnesses for defendant.

Another witness, J. R. Rich, an engineer, says he was rodman at the time the railroad was located on this lot, but that he did transit work; and afterwards, in 1904, he retraced the center line of the road through this property, and also located certain tracts around near the mouth of Cane Brake Branch in connection with obtaining rights of way for the railroad, and in that connection located the one acre tract as contended for by defendant. He says he took the very indefinite description of the lot—that stated in the reservation in the deed—and went to the northeast corner of the larger tract, and then began where the line of this property crossed the county road as indicated, and laid down the line to the hickory corner, and then ran down the county road far enough to include one acre; that the distance from where this line crossed the county road was 162 feet; and that they then ran along the road 264 feet parallel to the back property line. He says the road was there at that time. The witness had his field notes of that survey, made in January, 1905, and was able to refresh his memory from these notes. He also says as indicating the desirability of this location and as probably being the one intended by the parties, it was a great deal better suited for a house site or garden patch than the one located by plaintiff.

In addition to these expert or professional witnesses, defendant also produced several other witnesses well acquainted

with the location of the roads in that vicinity, particularly the road in question, all of whom agree that the old road referred to in the deed must be the one located by defendant's witnesses. J. H. Atwell, one of them, had been acquainted with the road since 1886; went there to see J. T. Myers, owner of the land. He located the barn lot, and swears that the road laid between the barn lot and the hill side.. He actually did work on these roads, from Jacob's Fork to Dry Fork; says that in building the road down Jacob's Fork he ran along Cane Brake Branch, and that opposite the Myers house the road ran between the barn lot and the hill. He remembers that there was a tram road along Dry Fork where the miners' houses now are, but on public road; thinks the tram road was built in 1907. He assisted in ditching the land where the miners' houses now are to turn the water out, in the spring of 1911.

C. C. Beavers lived in about three miles of this property and had known the roads there ever since he was a small boy; carried mail in 1876 from Perryville to Tazewell; and locates the road as running between the barn lot and the hill side, exactly as defendant's other witnesses do.

J. C. Beavers was acquainted with the location of the county road and remembers it substantially as defendant's other witnesses. He says there was no road between Dry Fork and where the defendant's miners' houses now are. If there ever was, he never saw it.

R. A. Crockett also locates the roads in the locality as defendant's other witnesses.

Also the witness M. H. Beavers, who was acquainted with the road through the Beavers property, locates the road called for by plaintiff's title papers substantially as defendant's other witnesses.

D. W. Sayers, still another witness, identifies the road as claimed by defendant and as the one he traveled in driving stock from 1890 to 1900.

We have not undertaken to detail all the evidence of the witnesses as to the location of this old road. It is not shown in evidence that either plaintiffs or their ancestors ever had possession of either the lot as claimed by them or as located by defendant. The coal company, on the other hand, had

its miners' houses, if not its tipple, on the land. The houses were built about 1910, and but for the fact that some of the plaintiffs are infants, the statute of limitations would bar recovery. The question, as already suggested, is, does the evidence of plaintiffs justify a verdict in their favor? Would the court on this state of facts have permitted a verdict in their favor to stand? It is not sufficient that there be a scintilla of evidence justifying a contrary verdict. *Cobb* v. *Glenn Boom & Lumber Company*, 57 W. Va. 49; *Ice* v. *County Court, supra.* In the first place, the lot called for in the exception or reservation was to be in the northeast end of the tract. As located by defendants the lot is exactly in that location. The line run by the earlier surveyors, including the engineer who originally partitioned the Myers tract, intersects the public road 162 feet from the hickory corner. The call in the deed is for where this Beavers tract crosses the county road. Of course, regarding the whole tract as crossing the county road, it might as well be located at one place as another, but interpreting the deed as best they could those engineers took the most reasonable view of the situation, and following one of the controlling facts, located the lot in the northeast end. We think they best interpreted the intention of the parties. This seems manifest whether we view the land as a 37 acre tract or as embracing the entire tract of 58.8 acres before the 21.8 acres was cut off. Looking at the 37 acre tract after the 21.8 acres were conveyed away, before the reservation was made, the location as found by the court was literally at the northeast end. It was not the northeast corner, but the northeast end that was called for. To locate the lot where plaintiffs claim it is, would put it in the southeast corner. In this case even plaintiffs' witnesses say that the lot is impossible of accurate location from the description in the deed. *Davis Colliery Company* v. *Westfall*, 78 W. Va. 735. Moreover, they say the lot sued for may be within the ten acres excepted in a deed of April 18, 1882, from J. F. Gamble and wife to J. T. Myers. There may be some virtue in this point. The burden was on plaintiffs. *Rock House Fork Land Company* v. *Gray*, 73 W. Va. 503. Before plaintiff can recover he must identify the land claimed by its external boundaries. *Fleming Oil & Gas Company* v. *South*

*Penn Oil Company,* 37 W. Va. 645; *Cobb* v. *Boom and Lumber Company, supra.*

And, in the light of all the surrounding facts and circumstances, we think another principle of controlling force is that by proper construction of the deed under which plaintiffs claim, the land called for must be located in the northeast end of the tract, not in the northeast or southeast corner, a question of law for the court and not of fact for the jury. *Davis Colliery Co.* v. *Westfall, supra.*

But counsel for plaintiffs argue that the rule applicable when there are disputed boundary lines and corners called for and there is conflicting evidence thereon, should have controlled, and that the questions of fact should have been submitted to the jury, relying on *Summerfield* v. *White,* 54 W. Va. 311. In that case there was a question of fact as to the true location of the beginning corner, no monument being called for, but simply a point "in the middle of Dry Fork at an agreed corner between Thomas S. White and Uriah White." The evidence was that Dry Fork had two channels in that locality, and in which of these and at what exact point the corner called for was, depended on the evidence, making it a question strictly for the jury, not one of law for the court, depending on conflicting evidence. In this case, by proper construction, the lot must be in the northeast end of the tract; no other locality will satisfy the call in the deed. Besides, the surveyors agree that as described in the deed the exact location of the lot was impossible. The burden was upon the plaintiff; and as many years elapsed after the attempted location of the lot by the railroad company and others interested, with apparent acquiescence by all parties therein, and there was no effort to disturb the railroad company or defendants in their occupancy of the land as shown, we think a verdict in favor of plaintiffs could not have been allowed to stand.

Another point of error is that the verdict failed to find the estate of the plaintiff in the land designated in the verdict, whether in fee or for life or for a term of years, in accordance with section 27, chapter 90 of the Code. But as that is not the lot sued for, the plaintiff can not justly be heard to complain of the form of the verdict directed. If

they had recovered the lot they sought to recover, of course the jury should have found 'their estate therein in accordance with the statute; but as they did not, they have no grievance on this score.

As to the judgment for costs in favor of defendant complained of the general rule is that the party prevailing shall recover his costs. Section 8, chapter 138 of the Code. What plaintiffs sought to have litigated was their right or claim to the lot occupied by defendant, not the one found by the verdict of the jury to be the location of their lot. They failed to make good their right and title to the lot for which they sued. The defendant prevailed against them. Plaintiffs should pay the costs. *Tracy* v. *Tracy's Heirs*, 14 W. Va. 243.

We are of opinion to affirm the judgment.

*Affirmed.*