ARTHUR CECIL EBERT *et al. v.* CLARA AUGUSTA EBERT

(No. 8745)

Submitted September 27, 1938. Decided December 6, 1938.

*J. J. Yankiss, Francis P. Moats, Richard C. Moore* and *Wm. Bruce Hoff,* for plaintiffs in error.

*Ambler, McCluer & Ambler,* for defendant in error.

FOX, JUDGE:

Charles Bennett Ebert, whose domicile was in Wood County, West Virginia, died on the 26th day of August, 1936, leaving a last will and testament, which, omitting the signature, is in the words and figures following:

> "Will of Charles Bennett Ebert, of Parkersburg, Wood County, West Virginia.
>
> "Not unmindful of my sons, Arthur Cecil and Millard Earl Ebert, I give all my estate both real and personal to my wife, Clara Augusta Ebert, in fee simple. My wife to be administratrix of my estate, without bond.
>
> "Drawn at Parkersburg, Wood County, West Virginia, this sixteenth (16th) day of January, nineteen hundred and thirty-three (1933)."

The body of the will and signature thereto are in the handwriting of the testator, and the will was witnessed by Laura B. Oliver and A. G. Oliver, who signed their names as subscribing witnesses to a typewritten attestation thereof.

The will was offered for probate in the county court of Wood County on September 5, 1936, by the beneficiary thereunder, and on that day Arthur Cecil Ebert and Millard Earl Ebert, sons and sole heirs-at-law of the testator, filed in said court their notice of contest, wherein it was charged:

> (1) "The said purported last will and testament was not executed in compliance with the formal requirements of law in relation to the execution of a last will and testament."

(2) "The purported last will and testament, now offered for probate, by Clara Augusta Ebert, the sole beneficiary and administratrix named therein, was made and executed as the result of fraud, duress, coercion, and undue influence used, practiced upon and exercised over the said Charles Bennett Ebert prior to, at and subsequent to the time of the making and execution of said will."

(3) "The said Charles Bennett Ebert lacked the required capacity to make and execute a valid will at the time of the making and execution of said purported will."

As stated in the brief filed by the contestants, the first and third grounds of contest were not urged, except to the extent of formally placing upon the proponent the burden of proof as to matters mentioned therein. This controversy, therefore, is confined to the allegation of fraud, duress, coercion and undue influence contained in the second paragraph quoted above.

When notice of contest was filed in the county court, the case was referred to a commissioner under the provisions of Code, 44-3-7. The commissioner to whom the case was referred resigned, and it was then re-referred to another commissioner. A hearing was had resulting in a report by the commissioner sustaining the will, and this report was confirmed by the county court of Wood County, whereupon the matter was appealed to the circuit court of Wood County and a trial de novo had, resulting in a verdict in favor of the contestants. This verdict was upon motion of the proponent set aside, and a new trial awarded the proponent, to which action of the court the contestants prosecute this writ of error.

Charles Bennett Ebert was seventy-two years of age at the time of his death. He was born in the City of Parkersburg, spent the greater part of his life there, and occupied a prominent place in the business and civic life of that community. From his mother, who died in 1920, he inherited as her sole heir-at-law real estate and other property, of the value of approximately $60,000.00. In

his early life he was engaged in the manufacture of brick in Parkersburg, and for a number of years prior to 1911, he followed the occupation of installing brick plants throughout the country, and spent a good part of his time away from Parkersburg. In 1911 he returned to Parkersburg and resided there until his death, having no particular occupation except that of looking after his extensive business interests principally connected with the management of his real estate, most of which he had inherited from his mother. He is shown to have been a man of good business judgment, firm in his opinions and not easily influenced. He remained in good health until immediately before his death, and there is no question raised upon the record in any way tending to show any lack of mental or physical vigor.

He was three times married. He first married Laura Richardson on July 1, 1886; of this marriage two children were born, Arthur Cecil Ebert, in 1887, and Millard Earl Ebert, in 1889, both of whom survived the testator and are the contestants in this proceeding, and will be hereinafter referred to as Cecil and Earl. Laura Richardson Ebert died in 1894. On July 4, 1898, the testator married Elizabeth Daisy Hagerty, from whom he obtained a divorce in 1908. On September 14, 1911, the testator married Clara Augusta Ripley McCoy, who then lived in Detroit, Michigan, and immediately following this marriage, he and his wife came to Parkersburg where they resided up to the date of his death. No children were born of the second and third marriages.

It appears from the record that upon the death of Laura Richardson Ebert in 1894, the testator made arrangements for the rearing of his two children, the contestants herein, and first placed them in the home of his mother, Frances V. Ebert, who then resided in Parkersburg. When about twelve years of age, Cecil was sent to a school in Pittsburgh and Earl, then about ten years of age, was placed by his father in the home of his paternal aunt, Sallie Lang, who then lived in Clarksburg. Cecil remained in Pittsburgh for about a year, and then

went to the Lang home in Clarksburg. When about eleven years of age, Earl, without his father's consent, left the Lang home and went to the home of his maternal grandparents, William and Margaret Richardson, in Parkersburg, apparently at the instigation of his maternal kin, where he remained until he joined his father in Detroit about the year 1909.. Cecil remained with Sallie Lang in Clarksburg for about a year after the departure of Earl, and then went to the home of his paternal grandmother, Frances V. Ebert, in Parkersburg, where he remained until he was about fifteen years of age when he, too, went to the home of his maternal grandparents, where he remained until he joined his father and Earl in Detroit about the year 1909. When Cecil was about fifteen years of age, it is in evidence that his father severely corrected him by the use of a horsewhip, which caused him to flee to the home of his maternal grandparents, and as the outgrowth of this incident, William Richardson, Cecil's maternal grandfather. swore out a warrant for Charles Bennett Ebert, and Cecil testified against his father at the trial on said warrant. Later, some one of the maternal kin of Cecil instituted suits against Charles Bennett Ebert for the maintenance of his two sons, which appear to have been finally settled in a compromise entered into on May 3, 1907. This family history is related for the purpose of showing the relations between the father and his two sons prior to 1909, when it seems they reconciled their differences at the time they joined each other in Detroit.

But this is not the full picture of the relationship between this father and his two sons. The younger son, Earl, married in Detroit and lived there until early in 1933. His father was at one time engaged in business with him, which proved unsuccessful and the accumulated indebtedness of the enterprise was paid by the father. From time to time, money was furnished to Earl by his father, notes endorsed for him which were not paid by the maker but were paid by the father, and while the relationship between them was at no time seriously

strained, it does appear that it was not satisfactory, because the father was apparently disappointed at the failure of his son to comply with his agreements to meet his financial obligations. However this may be, when Earl returned to Parkersburg in 1933, his father endorsed his note for $3,000.00, and in that way assisted him in setting up the business in which he is now engaged; and it appears that at the time of the death of Charles Bennett Ebert, more than half of this indebtedness remained unpaid. The relationship between Cecil and his father never was agreeable. The father made advancements to the son, in the way of loans which were never repaid, and there is a strong intimation that the father believed that the son had preferred his maternal kin in some of his financial transactions, and to the father's prejudice. The marital relations of Cecil were unfortunate. He, too, was married three times, two of his wives having obtained divorces on the grounds of his adultery, and his relations with another woman whom he did not marry were the subject of complaint on the part of the father. However, Cecil married a third time in 1922, and is the father of three children by that marriage, none of whom were ever taken to visit their grandfather, nor did they know him except as he may have been pointed out to them on the streets of Parkersburg. To whom that situation is chargeable is one of the disputed points in this case. Cecil seemed to have been under the impression that he was entitled to a settlement on account of property inherited by his father from Frances V. Ebert, and made demands therefor as early as 1921, as shown by a will executed by the testator in that year, and upon at least one later occasion, by writing, requested such a settlement. This request was made in 1926 when the father refused to aid his son in the purchase of a garage in Spencer. From a letter written in 1935 by the son to the father, it appears that the strained relationship between them still existed. The fact of the father's resentment toward his son on account of some of his demands is clearly mani-

fest in two former wills of the father to which reference will hereafter be made.

The contestants would minimize the fact of the differ-ences which may have existed between testator and his two children, and would ascribe failure of the testator to provide for them in his will to fraud, duress, coercion and undue influence practiced upon and exercised over the testator by his wife, Clara Augusta Ebert, proponent herein. As stated above, testator and proponent were married in Detroit in 1911. Earl testifies that prior to this marriage, he heard a conversation between his then wife and the proponent in which the proponent made an inquiry as to whether Charles Bennett Ebert had any property, and that she then stated, in effect, that if he did not have any property, she would not marry him. Cecil testified to a conversation he had with proponent in Detroit, prior to her marriage to the testator, in which she inquired whether his father had any money. It is admitted that they did not testify as to these conversations when the case was before the commissioner. They then show that following the marriage and over a long term of years the proponent, by various means, obtained title to property, inherited by Charles Bennett Ebert, either through direct conveyances to her or by convey-ances to the testator and the proponent or to the survivor of them, aggregating approximately $59,000.00, and that the property which will pass to the proponent under the will, if upheld, was appraised at $37,798.33, although this sum may include some personal estate held in the name of the testator "or Clara A. Ebert." Numerous convey-ances to and from these parties were introduced in evi-dence as showing how this situation was brought about. It is contended by the contestants that all of these transfers of property, prior to the execution of the will, and the execution of the will itself, were obtained by Clara Augusta Ebert in furtherance of a preconceived design, entertained at the time of her marriage to the testator, to obtain ownership and control of all his estate, to the exclusion of his lawful heirs. In support of this conten-

tion, they introduce testimony tending to show that the proponent stated, on more than one occasion, that she had stopped the testator from giving money to Cecil, and more than once threatened Earl that if he did not "watch his step", he would be disinherited as Cecil had been; that shortly after the death of Frances V. Ebert, the proponent told Cecil that he wasn't needed any longer and that he could go about his business, and further that his father, the testator, was not competent to properly care for his money and property, and that she was taking full charge of the same, and that she was only interested in her son, George L. McCoy; that when Earl returned to Parkersburg in January, 1933, and went to the home of some of his maternal kin, the proponent told him he might as well stay there, although the full force of this statement is somewhat weakened by the fact that later, when Earl, in July, 1933, brought to Parkersburg the woman who some two years later became his wife, the testator and his wife, in ignorance of the relationship existing between them at the time, invited them to occupy an apartment in the same building in which the testator and the proponent were living, and that the relationship between these people continued to be cordial and friendly. There never was any such pleasant relationship between the proponent and Cecil. The evidence shows that on one occasion when Cecil was having trouble with his third wife, the proponent expressed in rather strong language her dislike for him, stating that he was "no good" and that she would see that "he never gets a penny of the Ebert money"; and while there is some showing that she at one time expressed dislike for his children, this need not be considered seriously, because it appears that on another occasion, Cecil himself strongly resented a proposition made on the part of testator and the proponent that they would be willing, under certain circumstances, to take care of his wife and children. There is some testmony tending to show that the proponent was at times somewhat domineering in character, and attempted to exercise control over the movements of her husband; but

this testimony does nothing more, in our judgment, than show an assertive disposition on the part of the wife, and a desire to avoid controversy on the part of the husband, a situation not at all unusual in marital relations.

The fact that the testator executed other wills prior to the one offered for probate is disclosed in the record by the testimony of a reputable attorney residing in Parkersburg, who retained carbon copies of two wills prepared by him for the testator, one executed on the 7th of March, 1921, and the other on the 9th day of April, 1924. By the first will, all of his household and kitchen furniture and other personal effects, but not including securities, were bequeathed unto his wife, Clara Augusta Ebert; and all of the real estate conveyed in the deed from M. Lytle to Charles B. Ebert and Clara Augusta Ebert, dated August 5, 1920, which included a substantial part of his entire holdings of real estate and also his residence property in Parkersburg and a lot adjoining the same were devised to his said wife; she was then devised and bequeathed one-third of all the remainder of his property, real and personal. The remainder of his estate was devised and bequeathed to his executor in trust to be invested and the income thereof paid to his wife during her natural life or until she should remarry, and after her death, or remarriage, the principal and income of said trust fund was devised to his two sons, equally, except that $5,000.00 was to be deducted from Cecil's share "on account of the unreasonable and unlawful demands made by my son, Arthur Cecil Ebert, with harsh and threatening words, that I should now deliver to him what he claims to be his portion of my mother's estate upon the assumption that said portion was his and not mine"; and by this will the said sum was directed to be divided between Clara Augusta Ebert and Millard Earl Ebert, the share thereof going to his wife to be paid to her at the time of his death, and that going to Earl after the death of his wife or her remarriage. The will of April 9, 1924, is substantially the same as the will mentioned above, except that the sum of $2500.00 was directed to be paid

to Earl out of the trust fund created by the will and to be paid to him as soon as possible after the death of the testator, and the share of Cecil under this will was reduced $2500.00 for the reasons mentioned in the first will, the same to be divided between Earl and the stepson of the testator, George L. McCoy. In both of these wills, the statement is made that "my wife, Clara Augusta Ebert was kind and attentive to my mother, Frances V. Ebert, during her last illness and both on account of my love for my wife, and partially in return for the kind services rendered by her to my mother", and then follow the devises and bequests to her of one-third of the remainder of his property and incomes from the trust fund created, and both wills require that advancements made to Cecil and Earl subsequent to November, 1920, be charged against their portion of the estate. The provisions of these two wills are referred to as showing the attitude of testator toward his wife and his two sons at the time of the execution thereof, as well as to show that at that time the testator, in spite of his alleged dissatisfaction with the conduct of his sons before that date, was not disposed to totally disinherit either of them. Evidence of the execution of the two wills was clearly admissible. *Kerr* v. *Lunsford,* 31 W. Va. 659, 8 S. E. 493, 2 L. R. A. 668; *Payne* v. *Payne,* 97 W. Va. 627, 125 S. E. 818.

The proponent denies the conversation alleged to have been had with the wife of Earl prior to her marriage to the testator, and attempts to explain and partially denies some other statements with reference to disinheriting Cecil. There is no denial of the several financial transactions through which a large part of the Ebert estate was held in the name of the testator and the proponent under deeds providing for transfer of title to the survivor, nor that much of the stocks were held in the joint name of the testator and the proponent; the fact that they carried joint bank accounts, and that they conducted their business affairs jointly is, likewise, not denied. The evidence tends strongly to show a close, intimate and

happy relationship between the husband and wife during the twenty-five years they lived together as such, and the issue presented is whether or not the facts and circumstances developed by the contestants are sufficient to warrant us in holding that the execution of the will under consideration was obtained through the fraud, duress, coercion and undue influence of the proponent.

The record shows that the testator, while well advanced in years, was in full possession of his physical and mental powers and fully capable of executing a will, and, therefore, we do not have a case where age and physical and mental infirmities open a way for duress, coercion or undue persuasion. The will he executed is in his own handwriting, was witnessed by two persons outside his family, and was deposited in a safe in the office of an automobile association with which he was connected, and, so far as the record discloses, remained there until after his death. There is no showing that the proponent had any part in its preparation, or, unless it be by inference, that she even knew of its existence. The circumstances of its execution and deposit strongly indicate a voluntary and uninfluenced act of the testator, suggested in the first instance, perhaps, by the will of Calvin Coolidge which had been made public a few days previous, and the terms of which were followed closely by the testator. Nowhere in the record does it appear that, aside from the Coolidge will, the testator was influenced at that particular time, by any person, to make a will, or make a particular disposition of his estate. This being true, it seems appropriate to inquire as to the law governing a situation of this character. The rule is that a testator of sound mind has the right to dispose of his property in such manner as he may desire, and, in the absence of a showing of fraud or undue influence such as amounts to a substitution of the will of some other person for his own, the courts will not disturb such disposition of his property as he may make, however unjust and inequitable it may appear to others. In *Nicholas* v. *Kershner*, 20 W. Va. 251, this court held:

> "Where legal capacity is shown, and the testator acts freely, the validity of the will cannot be impeached, however unreasonable, imprudent or unaccountable it may seem to the jury or to others."

In *Couch* v. *Eastham*, 29 W. Va. 784, 3 S. E. 23, it was held:

> "When a testator has the legal capacity to make a will, he has the legal right to make an unequal, unjust or unreasonable will. *Voluntas stat pro ratione.*"

This rule is fully supported by other authorities both in this state and in other jurisdictions. *Hale* v. *Cole*, 31 W. Va. 576, 8 S. E. 516; *Coffman* v. *Hedrick*, 32 W. Va. 119, 9 S. E. 65; *Martin* v. *Thayer*, 37 W. Va. 38, 16 S. E. 489; *Woodville* v. *Woodville*, 63 W. Va. 286, 60 S. E. 140; *Wohlford* v. *Wohlford*, 121 Va. 699, 93 S. E. 629; *Forehand* v. *Sawyer*, 147 Va. 105, 136 S. E. 683; *Green* v. *Green's Exrs.*, 150 Va. 452, 143 S. E. 683; *In re Ewart's Estate*, 246 Pa. 579, 92 Atl. 708; *In re Ball's Estate*, 153 Wis. 27, 141 N. W. 8; *Burney* v. *Torrey*, 100 Ala. 157, 14 So. 685, 46 Am. St. Rep. 33; *Cutler* v. *Cutler*, 103 Wis. 258, 79 N. W. 240.

Undue influence may be exerted to control the actions of a person of sound mind, but it does not require authority to sustain the proposition that such influence is more easily shown to exist in cases where advanced age, physical or mental weakness is involved. In any case, however, undue influence, sufficient to invalidate a will, is never presumed, but must be established by proof. Jones on Evidence, sec. 541; 68 Corpus Juris, p. 779; *Coffman* v. *Hedrick, supra; Freeman* v. *Freeman*, 71 W. Va. 303, 76 S. E. 657; *Black* v. *Post*, 67 W. Va. 253, 67 S. E. 1072; *Price's Exr.* v. *Barham*, 147 Va. 478, 137 S. E. 511; *Councill* v. *Mayhew*, 172 Ala. 295, 55 Southern 314; *Beyer* v. *LeFevre*, 186 U. S. 114, 22 S. Ct. 765, 46 L. Ed. 1080. Such proof need not be direct but may be circumstantial, (*Hoffman* v. *Hoffman*, 192 Mass. 416, 78

N. E. 492; *Emery* v. *Emery*, 222 Mass. 439, 111 N. E. 287) but opportunity for, or possibility or suspicion of undue influence is not, alone, sufficient.

To warrant the setting aside of a deed or will the undue influence exerted to bring about its execution must be such as to destroy free agency of the maker, and, in legal effect, amount to force and coercion. *Parramore* v. *Taylor*, 11 Gratt. (Va.) 220; *Simmerman* v. *Songer*, 29 Gratt. (Va.) 9; *Coffman* v. *Hedrick, supra; Stewart* v. *Lyons*, 54 W. Va. 665, 47 S. E. 442; *Woodville* v. *Woodville, supra; Doak, Admr.,* v. *Smith*, 93 W. Va. 133, 116 S. E. 691; *Payne* v. *Payne, supra; Howard* v. *Howard*, 112 Va. 566, 72 S. E. 133; *Wooddy* v. *Taylor*, 114 Va. 737, 77 S. E. 498; *Dearing* v. *Dearing*, 132 Va. 178, 111 S. E. 286; *Floyd* v. *Floyd*, 3 Strob. 44, (S. C.) 49 Am. Dec. 626; *Saxton* v. *Krumm*, 107 Md. 393, 68 Atl. 1056, 17 L. R. A. (N. S.) 477, 126 Am. St. Rep. 393; *Kindt* v. *Parmenter*, 83 Okla. 116, 200 Pac. 706; *In re Schillenger's Will*, 258 N. Y. 186, 179 N. E. 380. The force and coercion necessary to invalidate a will need not be physical, or applied at any particular time. It is sufficient if, over a period of time, long or short, the influence which destroys the free agency of the testator results in the execution of a will which does not represent his true intent. *Walton* v. *Walton*, 168 Va. 418, 191 S. E. 768; *Snodgrass* v. *Weaver*, 120 W. Va. 444, 199 S. E. 1.

Influence obtained by acts of kindness, or persuasion and entreaty, are not alone sufficient to establish the fact that it was undue or improper. *Delaplain* v. *Grubb*, 44 W. Va. 416, 30 S. E. 201, 67 Am. St. Rep. 788; *Stewart* v. *Lyons, supra; Parramore* v. *Taylor, supra; Woodville* v. *Woodville, supra*; *Beyer* v. *LeFevre, supra; Payne* v. *Payne, supra*; *Burney* v. *Torrey, supra; Brooke* v. *Barnes*, 58 Fed. (2d) 887; 28 R. C. L. 147. The influence which a wife acquires over her husband, through her kindness and devotion to his interests, may well be the basis of a desire on his part to provide for her welfare, even to the exclusion of his children, without the exer-

tion of that influence being undue to the extent that it would invalidate a will executed as a result thereof.

With these authorities as our guide, we are unable to see that the contestants have made out a case of undue influence which would warrant us in invalidating the will of the testator. The extended narration of the evidence already set out in this opinion makes it unnecessary that we deal with it at length at this point. Whatever influence over the testator the proponent had was acquired as the result of an association of approximately twenty-five years, during which they lived together as man and wife. We are not here dealing with a case of a marriage of a testator when well advanced in years, followed shortly by the execution of a will in which the wife is preferred over his kin; nor are we dealing with a case where there is any specific showing of mental or physical weakness, or anything to indicate the exertion of any influence at any particular time. The theory of the contestants is that the execution of the will of the testator was brought about through the influence of the proponent, improperly exerted over a long period of years, to carry out an intent on her part, conceived before her marriage to the testator, and adhered to through all the years of her association with him. Their contentions rest mainly upon the fact that during these years, she acquired complete title to property of considerable value, formerly owned by the testator, and title through survivorship to property of still greater value, held in her name and that of the testator during his life. The fact that title to property of considerable value was vested in her through the acts of the testator may well be explained by his desire to provide for her future; and the further fact that other property was held in the name of himself and proponent with provisions that it would vest in the survivor, evinced his desire, not only to protect the future of his wife, but his own future, should he survive her. We see nothing in these transactions other than a natural desire on the part of the testator to hold his estate together for the benefit of either himself or his wife.

and we think they had little, if any, bearing on the circumstances surrounding the execution of the will under attack.

A further contention on the part of the contestants is that the alleged feeling on the part of the proponent against the contestants was used to poison the mind of the testator against them. There is, of course, evidence of the proponent's dislike for Cecil, but there is little to show such feeling as against Earl, and there is nothing, aside from inferences, showing that her feelings had anything to do with the attitude of the testator toward his children. It is quite apparent that the relations between the testator and his children were for many years unsatisfactory and never cordial to the degree usually existing between a father and son who have mutual confidence in and respect for each other. The attitude of the testator toward Cecil is clearly manifest by the two former wills he executed, one in 1921 and one in 1924. No such feeling is shown to have existed as against Earl, but running through the correspondence between them is a clear showing that the testator was not satisfied with the career of his son, and as to both, it may be reasonably said that he could well have had doubts of their ability to properly care for and use the considerable estate which, at the date of his last will, he had at his disposal. Moreover, the attitude of the proponent toward Earl, considering the entire period of their acquaintance, was not unfavorable, and apparently did not at all times extend to Cecil's wife and children, for it is in evidence that she was willing, under certain circumstances, to assist in caring for them. The relations between the proponent and Earl and his wife were cordial during the three years next preceding the death of the testator, and connected with statements made by her about Cecil, was an admonition to Earl to be careful that he should not incur his father's displeasure as Cecil had done. The showing of statements made by the proponent as to what she proposed to do with her husband's estate, or what she had done with respect to furnishing money to the testa-

tor's sons, or the isolated showing of her disposition to have her way in matters affecting the marital relations, fall far short of establishing undue influence such as is necessary to invalidate a will executed in the manner and under the circumstances of this case. The fact that the will was executed in January, 1933, and was not revoked is, in itself, a circumstance not to be lightly disregarded, although it may reasonably be contended that the same influence which brought about the execution of the will might operate to prevent its revocation.

Numerous cases from other jurisdictions have been cited by counsel for the contestants which they claim to be substantially similar to the case at bar. We have examined these cases with care. For the most part, they relate to situations where the testator was a man of great age, and usually both mentally and physically infirm, a 'fit subject for the exertion of influence on the part of one who held his affections, and in other cases, the use of intoxicants and drugs was involved; usually, the will was made in favor of a young wife, and within a short time after marriage, and the evidence was clear that a change in the attitude of the testator toward beloved children had occurred within a reasonable time after the marriage, and such as to create a doubt which was held to be the subject of jury inquiry. It would be useless to discuss all of these cases at length. We do not think they apply to the case at bar, because here the marriage occurred at a time when the testator and the proponent were in the prime of life and about the same age, and whatever influence the wife obtained over the husband came about through long association as husband and wife, the closest and most confidential of all human relations. While the disposition which this testator made of his property would, under ordinary circumstances, be considered as unusual, if not unnatural, there are circumstances shown by the evidence which tend to explain the testator's action, and afford reasonable justification for his acts.

Full consideration of the whole matter impels us to

hold that the evidence produced by the contestants before the jury, and all the inferences which might reasonably have been drawn therefrom, were insufficient to sustain the charge of undue influence on the part of the proponent, and the trial court was fully warranted in setting aside the verdict and granting a new trial.

Holding as we do that the circuit court, notwithstanding the added weight given to the contestants' case by the action of the jury, was warranted in setting aside the verdict, it necessarily follows that the motions to direct a verdict in favor of the proponent should have been sustained. The right of a court to direct a verdict on the trial of an issue of *devisavit vel non* in a will contest is upheld in the case of *Meade* v. *Meade,* 111 Va. 451, 69 S. E. 330. A trial of this issue seems to be governed by the rules of pleading applicable to the trial of an ordinary issue at law. There was a demurrer to the evidence on such an issue in *Stewart* v. *Lyons, supra,* and *Dearing* v. *Dearing, supra. Di Bacco* v. *Benedetto,* 82 W. Va. 84, 95 S. E. 601, was a case where there was an issue out of chancery, and it was held that the court could set aside a verdict and grant a new trial. In Virginia, under the practice existing in that state, a motion to strike out the evidence in a will case was entertained in *Walton* v. *Walton, supra.* It is clear, therefore, that the trial court had the right to entertain a motion of either party to direct a verdict, and to pass upon the same in the manner warranted by the record. On such a motion a verdict should be directed in a case where the court would feel impelled to set aside a verdict in favor of the opposite party on the evidence presented. *Ketterman* v. *Railroad Company,* 48 W. Va. 606, 37 S. E. 683; *Priddy* v. *Coal Company,* 64 W. Va. 242, 61 S. E. 163; *Hicks* v. *New River Company,* 95 W. Va. 17, 120 S. E. 898; *Wood* v. *Shrewsbury,* 117 W. Va. 569, 186 S. E. 294.

Cross assignments of error on the part of the proponent require little attention. The most important assignments have already been disposed of, leaving only those referring to admission of evidence and the giving

of instructions to be considered. Considering the wide range the evidence should be permitted to take in a case of this character, we are not disposed to disturb the ruling of the trial court in admitting stipulations B and F, which set forth the transactions relating to the acquisition and conveyance of the property of the testator and the proponent, prior to the execution of the will. The theory upon which the contestants tried their case justified the presentation to the jury of all these transactions. The testimony of Isabel Ebert and Eleanor Ebert, wives of Cecil and Earl Ebert, respectively, was inadmissable, so far as it in any wise related to personal transactions between them and the testator. *Freeman* v. *Freeman*, *supra*.

As to proponent's instructions, the court was not in error in refusing Nos. 6 and 7 for the reason that they are abstract and, in our opinion, lay undue stress on the unquestioned right of a testator of legal capacity to dispose of his property. We see no error in the amendment to No. 14-A. No. 15 was properly refused because covered by other instructions. We think No. 16 correctly states the law, and should have been given. The court was correct in refusing No. 19, for the reason that it too broadly states the proposition covered thereby. No. 22 was properly refused because repetitious.

As to instructions offered on the part of the contestants, we think No. 1 was properly given. Nos. 2 and 2-A should not have been given because of the reference to undue influence which the testator could not "well resist". Notwithstanding the fact that this instruction appears to have been used in cases tried under the Virginia practice, we think it furnishes too broad a basis for jury determination and is in conflict with the established rule that the influence exerted must be irresistible. *Stewart* v. *Lyons*, *supra*. Nos. 4-A and 5 were, in our opinion, proper. Nos. 7 and 9 are open to the objection that they are not in themselves complete, each of them referring to other instructions, or to evidence to which the instructions do not specifically relate. They are confusing and

tend to give to the jury too much lattitude with respect to inferences. A case cannot rest on inferences alone. No. 10-A should have been refused. It singles out particular testimony, and submits to the jury the question of the age and mental and physical condition of the testator at the date of the will, an issue not involved in this case.

We have not attempted to carefully appraise all of these instructions, but merely to indicate our general views with respect to them, as an aid to counsel in the re-trial of the case. This case illustrates a use of the right to request instructions from the court, on the part of both counsel for the proponent and contestants, which we do not approve. The issue being narrowed to that of the existence or non-existence of undue influence, the large number of instructions tended to confuse rather than throw light on that issue. Instructions tending to simplify the issue are suggested for the new trial which this decision calls for.

The judgment of the circuit court is affirmed.

*Affirmed.*